# UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF IOWA

| | |
|---|---|
| IN RE: | Chapter 11 |
| PEARL CITY GARAGE, INC., | Bankruptcy No. 19-00221 |
| Debtor. | MOTION TO USE CASH COLLATERAL |

COMES NOW the Debtor in the above captioned Chapter 11 case, through its undersigned counsel, and hereby moves the Court to enter an order authorizing it to use cash collateral of Northwest Bank of Davenport, Iowa (hereinafter "Bank") and On Deck Capital, Inc. of Arlington, VA (hereinafter "On Deck") for purposes of continuing business operations, stating the following:

1. The Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2). Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

2. The Debtor filed its Chapter 11 Petition on February 7, 2019.

3. The Debtor is a factory engaged in the business of painting and anodizing metal parts in Muscatine, Iowa. Debtor continues in possession of his property and the management of its painting and anodizing operation and intends to operate as a Debtor in Possession pursuant to 11 U.S.C. § 1203.

## Background

4. Debtor has been financed by Northwest Bank ("Bank") since April 11, 2016.

5. Bank claims to hold a perfected security interest the following collateral by virtue of the financing statement E16026244-0 filed on April 11, 2016:

Accounts and Other Rights to Payments: All rights to payment, whether or not earned by performance, including, but limited to, payment for property or services sold, leased, rented, licensed, or assigned. This included any rights and interests (including all liens)

which Debtor may have by law or agreement against any account debtor or obliger of Debtor. Inventory: All inventory held for ultimate sale or lease, or which has been or will be supplied under contracts of service, or which are raw materials, work in process, or materials used or consumed in Debtor's business. Equipment: All equipment including, but not limited to, machinery, vehicles, furniture, fixtures, manufacturing equipment, farm machinery and equipment, shop equipment, parts, and tools. The property includes any equipment described in a list or schedule Debtor gives to Secured Party, but such a list is not necessary to create or perfect a valid security interest in all of Debtor's equipment. Instruments and Chattel Paper: All instruments, including negotiable instruments and promissory notes and any other writings that evidence the right to payment of a monetary obligation, and tangible and electronic chattel paper. General Intangibles: All general intangibles including, but not limited to, tax refunds, patents and applications for patents, copyrights, trademarks, trade secrets, goodwill, trade names, customer lists, permits and franchises, payment intangibles, computer programs and all supporting information provided in connection with a transaction relating to computer programs, and the right to use the Debtor's name. Documents: All documents of title including, but not limited to, bills of lading, dock warrants and receipts, and warehouse receipts. Government Payments and Programs: All payments, accounts, general intangibles, and benefits including, but not limited to payment in kind, deficiency payments, letters of entitlement, warehouse receipts, storage payments, emergency assistance and diversion payments, production flexibility contracts, and conservation reserve payments under any preexisting, current or future federal or state government program pr. Investment Property: All investment property including, but not limited to, certificated securities, un-certificated securities, securities entitlements, securities accounts, commodity contracts, commodity accounts, and financial assets. Deposit Accounts: All deposit accounts including, but not limited to, demand, time, savings, passbook, and similar accounts.

A copy of the Bank's financing statement is attached as Exhibit "A".

6.      The Debtor granted a security interest in the above stated collateral through its execution of a Commercial Security Agreement on April 11, 2016.  A copy of the Commercial Security Agreement executed by the Debtor in favor of Bank is attached hereto as Exhibit "B".

7.      On Deck claims to hold a perfected security interest the following collateral by virtue of the financing statement X17032401-6 filed on October 26, 2017:

All of Debtor's right title and interest, whether now existing or hereafter acquired, in and to any and all assets of the Debtor.

A copy of On Deck's financing statement is attached as Exhibit "C".

8.      Debtor granted a security interest to On Deck by its execution of a Business Loan and Security Agreement, which is attached to this Motion as Exhibit "D".

9.      To the best of Debtor's knowledge, the security interest of On Deck is inferior to the security interest of Bank as no subordination agreements exist and, the debt owed to Bank exceeds the value of Bank's collateral.

### Generation and Use of Cash Collateral

10.      The Debtor has money in its operating and payroll accounts at Bank and continues to receive payments on its accounts receivable from its customers.  The total current balance in the Debtor's accounts at the Bank is $29,656.61.

11.      In addition to the money in its account listed in paragraph 10, Debtor has accounts receivable in the approximate amount of $186,301.00 which are collateral of both Bank and On Deck.

12.      Debtor plans to continue the operation of its business after filing this bankruptcy. The initial use of cash collateral will be to pay wages and continue operations as it relocates its business.

13.      The Debtor cannot obtain this credit on an unsecured basis and has attempted to do so.

14.      Debtor proposes to offer as replacement collateral a first security interest in the post-petition accounts receivable.  This should be adequate protection for use of grain proceeds to pay rent and other inputs for the crops.

WHEREFORE, the Debtor respectfully requests that this Court enter an order authorizing it to utilize cash collateral currently in the form of money in its bank accounts as well as ongoing receipts from payments received on its accounts receivable, and that this Court grant such other

and further relief as it deems equitable, given the circumstances.

Dated this 7th day of February 2019.

Respectfully submitted,

AG & BUSINESS LEGAL STRATEGIES

/s/ Joseph A. Peiffer
Joseph A. Peiffer AT0006160
P.O. Box 11425
Cedar Rapids, Iowa 52410-1425
Telephone:  (319) 363-1641
FAX:  (319) 200-2059
E-mail: joe@ablsonline.com
ATTORNEY FOR DEBTOR

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on the 7th day of February 2019, a copy of the foregoing document was filed with the Clerk of Court for the United States Bankruptcy Court for the Southern District of Iowa using the CM/ECF system and served electronically on those participants that receive service through the CM/ECF System.  The undersigned further certifies the foregoing document was sent to persons or representatives via electronic mail or U.S. Mail postage pre-paid as set forth below.

/s/ Jeffrey Brookens

Candy Pastrnak
Attorney for Northwest Bank
ckpastrnak@pastrnak.com

On Deck Capital, Inc.
support@ondeck.com

E16026244-0

# UCC FINANCING STATEMENT
FOLLOW INSTRUCTIONS

**FILED
SECRETARY OF STATE
IOWA**

2016-04-11 08:19

| A. NAME & PHONE OF CONTACT AT FILER (optional) |
| --- |

| B. E-MAIL CONTACT AT FILER (optional) |
| --- |

C. SEND ACKNOWLEDGEMENT TO: (Name and Address)

NORTHWEST BANK & TRUST CO

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

DEBTOR'S NAME: Provide only one Debtor name - use exact, full name; do not omit, modify, or abbreviate any part of the debtor's name

| ORGANIZATION'S NAME | | | | |
| --- | --- | --- | --- | --- |
| PEARL CITY GARAGE, INC. | | | | |
| INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| PO BOX 47 | MUSCATINE | IA | 52761 | USA |

SECURED PARTY'S NAME (or NAME of ASSIGNEE of ASSIGNOR SECURED PARTY) Provide only one Secured Party name

| ORGANIZATION'S NAME | | | | |
| --- | --- | --- | --- | --- |
| NORTHWEST BANK & TRUST COMPANY | | | | |
| INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| 100 E Kimberly Road | Davenport | IA | 52806 | USA |

COLLATERAL: This financing statement covers the following collateral:

Accounts and Other Rights to Payments: All rights to payment, whether or not earned by performance, including, but limited to, payment for property or services sold, leased, rented, licensed, or assigned. This included any rights and interests (including all liens) which Debtor may have by law or agreement against any account debtor or obligor of Debtor. Inventory: All inventory held for ultimate sale or lease, or which has been or will be supplied under contracts of service, or which are raw materials, work in process, or materials used or consumed in Debtor's business. Equipment: All equipment including, but not limited to, machinery, vehicles, furniture, fixtures, manufacturing equipment, farm machinery and equipment, shop equipment, parts, and tools. The property includes any equipment described in a list or schedule Debtor gives to Secured Party, but such a list is not necessary to create or perfect a valid security interest in all of Debtor's equipment. Instruments and Chattel Paper: All instruments, including negotiable instruments and promissory notes and any other writings or records that evidence the right to payment of a monetary obligation, and tangible and electronic chattel paper. General Intangibles: All general intangibles including, but not limited to, tax refunds, patents and applications for patents, copyrights, trademarks, trade secrets, goodwill, trade names, customer lists, permits and franchises, payment intangibles, computer programs and all supporting information provided in connection with a transaction relating to computer programs, and the right to use the Debtor's name. Documents: All documents of title including, but not limited to, bills of lading, dock warrants and receipts, and warehouse receipts. Government Payments and Programs: All payments, accounts, general intangibles, and benefits including, but not limited to , payment in kind, deficiency payments, letters of entitlement, warehouse receipts, storage payments, emergency assistance and diversion payments, production flexibility contracts, and conservation reserve payments under any preexisting, current or future federal or state government program pr. Investment Property: All investment property including, but not limited to, certificated securities, un-certificated securities, securities entitlements, securities accounts, commodity contracts, commodity accounts, and financial assets. Deposit Accounts: All deposit accounts including, but not limited to, demand, time, savings, passbook, and similar accounts.

Check only if applicable and check only one box: Collateral is:  ☐ held in a Trust   ☐ being administered by a Decedent's Personal Representative

| Check only if applicable and check only one box: | | Check only if applicable and check only one box: | |
| --- | --- | --- | --- |
| ☐ Public-Finance Transaction   ☐ Manufactured-Home Transaction   ☐ A Debtor is a Transmitting Utility | | ☐ Agricultural Lien   ☐ Non-UCC Filing | |
| ALTERNATIVE DESIGNATION (if applicable):   ☐ Lessee/Lessor   ☐ Consignee/Consignor   ☐ Seller/Buyer   ☐ Bailee/Bailor   ☐ Licensee/Licensor | | | |

OPTIONAL FILER REFERENCE DATA

| ☐ This FINANCING STATEMENT is to be filed (for record) (or recorded) in the REAL ESTATE RECORDS (if applicable) | This FINANCING STATEMENT: ☐ covers timber to be cut   ☐ covers as-extracted collateral   ☐ is filed as a fixture filing |
| --- | --- |
| Name and address of a RECORD OWNER of real estate described (if Debtor does not have a record interest). | Description of real estate: |

MISCELLANEOUS

**Exhibit "A"**

COMMERCIAL SECURITY AGREEMENT

**Northwest Bank & Trust Company**
100 E Kimberly Rd
DAVENPORT, Iowa 52806-
(563)388-2511
cheller@northwestbank.com

| LOAN NUMBER | AGREEMENT DATE | |
|---|---|---|
| 5251574 | April 11, 2016 | |

**BORROWER INFORMATION**

PEARL CITY GARAGE, INC.
PO BOX 47
MUSCATINE, IA 52761

**COLLATERAL OWNER INFORMATION**

PEARL CITY GARAGE, INC.
PO BOX 47
MUSCATINE, IA 52761

**AGREEMENT.** For purposes of this document, the term "Agreement" is used when reference is made to this Commercial Security Agreement.

**LENDER.** "Lender" means Northwest Bank & Trust Company whose address is 100 E Kimberly Rd, DAVENPORT, Iowa 52806- , its successors and assigns.

**DEBTOR.** For purposes of this Agreement, "Debtor" refers to any party to this Agreement, whose name and address is recited above, and who executes this Agreement.

**SECURITY INTEREST GRANT.** Debtor, in consideration of the Obligations to Lender, as defined in the "OBLIGATIONS" provision below, hereby agrees to all of the terms of this Agreement and further hereby specifically grants Lender a continuing security interest in the Collateral as defined in the "DESCRIPTION OF COLLATERAL" provision below. Debtor further grants Lender a security interest in the proceeds of said Collateral; the proceeds of hazard insurance and eminent domain or condemnation awards involving the Collateral; all products of, and accessions to, such Collateral or interests therein; any and all deposits or other sums at any time credited by or due from Lender to Debtor; and any and all instruments, documents, policies, and certificates of insurance, securities, goods, accounts receivable, choses in action, chattel paper, cash, property, and the proceeds thereof (whether or not the same are Collateral or proceeds thereof hereunder), owned by Debtor or in which Debtor has an interest which are now or at any time hereafter in possession or control of Lender, or in transit by mail or carrier to or from Lender, or in possession of any third party acting on Lender's behalf, without regard to whether Lender received the same in pledge, for safekeeping, as agent or otherwise, or whether Lender has conditionally released the same. Debtor's grant of a continuing security interest in the foregoing described Collateral secures to Lender the payment of all loans, advances, and extensions of credit from Lender to Borrower, including all renewals and extensions thereof, and any and all obligations of every kind whatsoever, whether heretofore, now, or hereafter existing or arising between Lender and Borrower and howsoever incurred or evidenced, whether primary, secondary, contingent, or otherwise.

**OBLIGATIONS.** As used in this Agreement, the term "Obligations" shall mean any and all of Debtor's obligations to Lender, whether they arise under this Agreement or the note, loan agreement, guaranty, or other evidence of debt executed in connection with this Agreement, or under any other mortgage, trust deed, deed of trust, security deed, security agreement, note, lease, instrument, contract, document, or other similar writing heretofore, now, or hereafter executed by the Borrower to Lender, including any renewals, extensions and modifications thereof, and including oral agreements and obligations arising by operation of law. The Obligations shall also include all expenditures that Lender may make under the terms of this Agreement or for the benefit of Borrower or Debtor, all interest, costs, expenses, and attorneys' fees accruing to or incurred by Lender in enforcing the Obligations or in the protection, maintenance, preservation, or liquidation of the Collateral, and any of the foregoing that may arise after the filing of any petition by or against Borrower or Debtor under the Bankruptcy Code, irrespective of whether the obligations do not accrue because of the automatic stay under Bankruptcy Code Section 362 or otherwise.

**RELATED DOCUMENTS.** The words "Related Documents" mean all promissory notes, security agreements, prior mortgages, prior deeds of trust, prior deeds to secure debt, business loan agreements, construction loan agreements, resolutions, guaranties, environmental agreements, subordination agreements, assignments of leases and rents and any other documents or agreements executed in connection with this Agreement whether now or hereafter existing, including any modifications, extensions, substitutions or renewals of any of the foregoing. The Related Documents are hereby made a part of this Agreement by reference thereto, with the same force and effect as if fully set forth herein.

**DESCRIPTION OF COLLATERAL.** The collateral covered by this Agreement (the "Collateral") is all of Debtor's assets including, without limitation, documents, documents of title (including, without limitation, warehouse receipts and bills of lading), "As-Extracted Collateral," "Fixtures," "Goods," and all of the Debtor's property described below which the Debtor now owns or may hereafter acquire or create and all proceeds and products thereof, whether tangible or intangible, including proceeds of insurance and which may include, but shall not be limited

© 2004-2015 Compliance Systems, Inc. 6621ecce-134ds32d - 2015.12.2.331
Commercial - Security Agreement DL4008

Page 1 of 9

Initials DRB

www.compliancesystems.com

**Exhibit "B"**                    **Page 1 of 9**

to, any items listed on any schedule or list attached hereto. The Collateral described has the meanings contained in the Uniform Commercial Code as adopted in the state where the Lender is located.

**Equipment.** "Equipment" shall consist of all goods of the Debtor that are not inventory, farm products, or consumer goods. Equipment includes, but is not limited to, all equipment and fixtures of every nature and description whatsoever, now owned or hereafter acquired by Debtor, wherever located, including all machinery, manufacturing equipment, shop equipment, furnishings, furniture, record keeping equipment, and vehicles, together with all accessions, parts, embedded software, attachments, accessories, tools, and dies, or appurtenances thereto intended for use in connection therewith, and all substitutions, betterments, and replacements thereof and additions thereto.

**Accounts.** "Accounts" consist of the Debtor's right to payment of a monetary obligation, whether or not earned by performance, (i) for property that has been or is to be sold, leased, licensed, assigned, or otherwise disposed of; (ii) for services rendered or to be rendered; (iii) for a policy of insurance issued or to be issued; (iv) for a secondary obligation incurred or to be incurred; (v) for energy provided or to be provided; (vi) for the use or hire of a vessel under a charter or other contract; (vii) arising out of the use of a credit card or charge card or information contained on or for use with the card; (viii) as winnings in a lottery or other game of chance operated or sponsored by a state, governmental unit of a state, or person licensed or authorized to operate the game by a state or governmental unit of a state; or (ix) for health-care-insurance receivables.

**Inventory.** "Inventory" consists of all inventory and goods, other than farm products, which (i) are leased by Debtor as lessor, (ii) are held by Debtor for sale or lease or to be furnished under a contract of service, (iii) are furnished by Debtor under a contract of service, or (iv) consist of raw materials, work in process, or materials used or consumed in business.

**Instruments.** "Instruments" consist of all negotiable instruments and other writings owned or acquired by the Debtor that evidence a right to the payment of a monetary obligation, and are of a type that in the ordinary course of business are transferred by delivery with all necessary endorsements or assignments. Instruments are not themselves security agreements or leases. The term does not include investment property, letters of credit, or writings that evidence a right to payment arising out of the use of a credit or charge card or information contained on or for use with the card.

**General Intangibles.** "General Intangibles" shall consist of all personal property now owned or hereafter acquired by the Debtor, including things in action, other than accounts, chattel paper, commercial tort claims, deposit accounts, goods, instruments, investment property, letter of credit rights, letters of credit, money, and oil, gas, or other minerals before extraction. General Intangibles shall also include all payment intangibles now held or hereafter acquired by Debtor and all software now owned or hereafter acquired by Debtor, which is not encompassed by the term "Goods," and all supporting information pertaining or relating thereto. General Intangibles include, but are not limited to, intellectual property, rights that arise under a license of intellectual property, including the right to exploit the intellectual property without liability for infringement, and the right to payment of a loan of funds that is not evidenced by chattel paper or an instrument.

**Investment Property.** "Investment Property" shall consist of all securities, whether certificated or uncertificated, security entitlements, securities accounts, commodities contracts, and commodities accounts now held or hereafter acquired by the Debtor, together with all contracts, instruments, and general intangibles related thereto and all monies, income, proceeds, and benefits attributable or accruing to said property, including, but not limited to, all stock rights, options, rights to subscribe, dividends, liquidating dividends, stock dividends, dividends paid in stock, new securities, and the properties and benefits to which the Debtor is, or may hereafter become, entitled to receive on account of said property.

**Chattel Paper.** "Chattel Paper" shall consist of all records now held or hereafter acquired by Debtor that evidence both a monetary obligation and a security interest in specific goods, a security interest in specific goods and software used in the goods, a security interest in specific goods and license of software used in the goods, a lease of specific goods, or a lease of specific goods and license of software used in the goods. In this paragraph, "monetary obligation" means a monetary obligation secured by the goods or owed under a lease of the goods and includes a monetary obligation with respect to software used in the goods. The term does not include (i) charters or other contracts involving the use or hire of a vessel, or (ii) records that evidence a right to payment arising out of the use of a credit card or charge card of information contained on or for use with the card. If a transaction is evidenced by records that include an instrument or series of instruments, the group of records taken together constitutes chattel paper. The definition of chattel paper includes electronic chattel paper. Debtor agrees that it will assist Lender in obtaining control of electronic chattel paper by (i) creating a single authoritative copy of the record(s) existing which is unique and identifiable, (ii) ensuring that the authoritative copy identifies the Lender as the assignee of the record(s), and (iii) ensuring that the authoritative copy is communicated to and maintained by the Lender or its designated custodian. Copies or revisions that add or change an identified assignee of the authoritative copy can be made only with the participation of the Lender. Debtor agrees that each copy or authoritative copy and any copy of a copy shall be readily identifiable as a copy that is not the authoritative copy, and any revision of any authoritative copy is readily identifiable as an authorized or unauthorized revision.

**Titled Vehicle.** "Titled Vehicle" consists of any and all vehicle(s) and all additions and accessions to the vehicle(s), and any replacements and substitutions of the vehicle(s). It also includes all documents of title related to the vehicle(s) as well as all products, rents, and proceeds of the vehicle(s).

**Deposit Accounts.** "Deposit Accounts" shall consist of all demand, time, savings, passbook, and similar deposit accounts which are now or are hereafter held by the Debtor in Lender's institution, or maintained in another bank ("Bank") and for which Debtor, Lender and Bank have entered into a duly executed Control Agreement (as used herein, the term "Bank" means an organization that is engaged in the business of banking, and includes banks, savings banks, savings and loan associations, credit unions, and trust companies), unless the deposit is a type of qualifying tax-deferred account as defined in the Internal Revenue Code, as currently in effect and amended from time to time (e.g. Individual Retirement Arrangements, qualified retirement plans, Health Savings Accounts, etc.).

**WARRANTIES.** The Debtor warrants the following: Debtor has or will acquire free and clear title to all of the Collateral, unless otherwise provided herein; the security interest granted to the Lender shall be a first security interest, and the Debtor will defend same to the Lender against the claims and demands of all persons; the Debtor will fully cooperate in placing or maintaining Lender's lien or security interest; the Debtor agrees not to allow or permit any lien, security interest, adverse claim, charge, or encumbrance of any kind against the Collateral or any part thereof, without the Lender's prior written consent; all of the Collateral is located in the state of the Debtor's address specified at the beginning of this Agreement, unless otherwise certified to and agreed to by the Lender, or, alternatively, is in possession of the Lender; the Debtor will not remove or change the location of any Collateral without the Lender's prior written consent; the Debtor will use the Collateral only in the conduct of its own business, in a careful and proper manner; the Debtor will not use the Collateral or permit it to be used for any unlawful purpose; except as otherwise provided in this Agreement with respect to inventory, Debtor will not, without the Lender's prior written consent, sell, assign, transfer, lease, charter, encumber, hypothecate, or dispose of the Collateral, or any part thereof, or any interest therein, nor will Debtor offer to sell, assign, transfer, lease, charter, encumber, hypothecate, or dispose of the Collateral, or any part thereof, or any interest therein; the Debtor will not conduct business under any name other than that given at the beginning of this Agreement, nor change, nor reorganize the type of business entity as described, except upon the prior written approval of the Lender, in which event the Debtor agrees to execute any documentation of whatsoever character or nature demanded by the Lender for filing or recording, at the Debtor's expense, before such change occurs; the information regarding Debtor's state of organization or formation as set forth in the Resolution is correct, and Debtor further warrants that Debtor will not change Debtor's state of organization or formation without Lender's prior written consent and will assist Lender with any changes to any documents, filings, or other records resulting or required therefrom; the Debtor will keep all records of account, documents, evidence of title, and all other documentation regarding its business and the Collateral at the address specified at the beginning of this Agreement, unless notice thereof is given to the Lender at least ten (10) days prior to the change of any address for the keeping of such records; the Debtor will, at all times, maintain the Collateral in good condition and repair and will not sell or remove same except as to inventory in the ordinary course of business; the Debtor is a legally created business entity, as described before, and it has the power, and the person signing is duly authorized, to enter into this Agreement; the execution of this Agreement will not create any breach of any provision of the Debtor's organizational documents (Articles of Incorporation and By-Laws if the Debtor is a corporation, Articles of Organization and Operating Agreement if the Debtor is a limited liability company, or Certificate of Limited Partnership (if applicable) or Partnership Agreement if the Debtor is a partnership), or any other agreement to which the Debtor is or may become a party; all financial information and statements delivered by the Debtor to the Lender to obtain loans and extensions of credit are true and correct and are prepared in accordance with generally accepted accounting principles; there has been no material adverse change in the financial condition of the Debtor since it last submitted any financial information to the Lender; there are no actions or proceedings, including set-off or counterclaim, which are threatened or pending against the Debtor which may result in any material adverse change in the Debtor's financial condition or which might materially affect any of the Debtor's assets; and the Debtor has duly filed all federal, state, municipal, and other governmental tax returns, and has obtained all licenses, permits, and the like which the Debtor is required by law to file or obtain, and all such taxes and fees for such licenses and permits required to be paid, have been paid in full.

**INSURANCE.** The Debtor agrees that it will, at its own expense, fully insure the Collateral against all loss or damage for any risk of whatsoever nature in such amounts, with such companies, and under such policies as shall be satisfactory to the Lender. All policies shall expressly provide that the Lender shall be the loss payee or, alternatively, if requested by Lender, mortgagee. The Lender is granted a security interest in the proceeds of such insurance and may apply such proceeds as it may receive toward the payment of the Obligations, whether or not due, in such order as the Lender may in its sole discretion determine. The Debtor agrees to maintain, at its own expense, public liability and property damage insurance upon all its other property, to provide such policies in such form as the Lender may approve, and to furnish the Lender with copies of other evidence of such policies and evidence of the payments of the premiums thereon. All policies of insurance shall provide for a minimum 30 days' written notice of cancellation to Lender. At the request of Lender, such policies of insurance shall be delivered to and held by Lender. Debtor agrees that Lender is authorized to act as attorney for Debtor in obtaining, adjusting, settling, and canceling such insurance and endorsing any drafts or instruments issued or connected with such insurance. Debtor specifically authorizes Lender to disclose information obtained in conjunction with this Agreement and from policies of insurance to prospective insurers of the Collateral. If the Debtor at any time fails to obtain or to maintain any of the insurance required above or pay any premium in whole or in part relating thereto, the Lender, without waiving any default hereunder, may make such payment or obtain such policies as the Lender, in its sole discretion, deems advisable to protect the Debtor's property. All costs incurred by the Lender, including reasonable attorneys' fees, court costs, expenses, and other charges thereby incurred, shall become a part of the Obligations and shall be payable on demand.

**ACCOUNTS.** As of the time any account becomes subject to the security interest (or pledge or assignment as applicable) granted hereby, Debtor shall be deemed further to have warranted as to each and all of such accounts as follows: (a) each account and all papers and documents relating thereto are genuine and in all respects what they purport to be; (b) each account is valid and subsisting and arises out of a bona fide sale of goods sold and delivered to, or out of and for services theretofore actually rendered by Debtor to, the account debtor named in the account or other bona fide transaction; (c) the amount of the account represented as owing is the correct amount actually and unconditionally owing except for normal cash discounts and is not subject to any setoffs, credits, defenses, or countercharges; and (d) Debtor is the owner thereof free and clear of any charges, liens, security interests, adverse claims, and encumbrances of any and every nature whatsoever.

Lender shall have the right in its own name or in the name of the Debtor, whether before or after default, to require Debtor: (1) to transmit all proceeds of collection of accounts to Lender; (2) to notify any and all account debtors to make payments of the accounts directly to Lender; (3) to demand, collect, receive, receipt for, sue for, compound, and give acquittal for, any and all amounts due or to become due on the accounts and to endorse the name of the Debtor on all commercial paper given in payment or part payment thereof; and (4) in Lender's discretion, to file any claim or take any other action or proceeding that Lender may deem necessary or appropriate to protect and preserve and realize upon the accounts and related Collateral.

Unless and until Lender elects to collect accounts, and the privilege of Debtor to collect accounts is revoked by Lender in writing, Debtor shall continue to collect accounts, account for same to Lender, shall not commingle the proceeds of collections of accounts with any funds of the

Debtor, and shall deposit such proceeds in an account with Lender. In order to assure collection of accounts in which Lender has an interest hereunder, Lender may notify the post office authorities to change the address for delivery of mail addressed to Debtor to such address as Lender may designate, open and dispose of such mail, and receive the collections of accounts included therewith. Lender shall have no duty or obligation whatsoever to collect any account or to take any other action or preserve or protect the Collateral; however, should Lender elect to collect any account or take possession of the Collateral, Debtor releases Lender from any claim or claims for loss or damage arising from any act or omission in connection therewith, and costs of collection incurred by Lender shall be an obligation secured hereby and constitute a portion of the Obligations.

Upon request by Lender, whether before or after default, Debtor shall take such action and execute and deliver such documents as Lender may reasonably request in order to identify, confirm, mark, segregate, and assign accounts and to evidence Lender's interest in same. Without limiting the foregoing Debtor, upon request, agrees to assign accounts to Lender, identify and mark accounts as being subject to the security interest for pledge (or assignment as applicable) granted hereby, mark Debtor's books and records to reflect such assignments, and forthwith to transmit to Lender in the form as received by Debtor any and all proceeds of collection of such accounts.

Debtor will deliver to Lender, prior to the 10th day of each month, or with such other frequency as Lender may request, a written report in form and content satisfactory to Lender, showing a listing and aging of accounts and such other information as Lender may request from time to time. Debtor shall immediately notify Lender of the assertion by any account debtor of any setoff, defense, or claim regarding an account or any other matter adversely affecting an account.

Returned or repossessed goods arising from or relating to any accounts included within the Collateral shall, if requested by Lender, be held separate and apart from any other property, Debtor, on request by Lender, but not less than weekly even though no request has been made, shall report to Lender identifying information with respect to any such goods relating to accounts included in transactions under this Agreement.

**INVENTORY.** Debtor will deliver to Lender prior to the 10th day of each month, or on such other frequency as Lender may request, a written report in form and content satisfactory to Lender, with respect to the preceding month or other applicable period showing Debtor's opening inventory, inventory acquired, inventory sold, inventory returned, inventory used in Debtor's business, closing inventory, and other inventory not with the preceding categories, and such other information as Lender may request from time to time. Debtor shall immediately notify Lender of any matter adversely affecting the inventory, including, without limitation, any event causing loss or depreciation in the value of the inventory and the amount of such possible loss or depreciation.

Debtor will promptly notify Lender in writing of any addition to, change in, or discontinuance of its place(s) of business as shown in this Agreement, and the location of the office where it keeps its records. All Collateral will be located at the place(s) of business shown herein, as modified by any written notice(s) given pursuant hereto.

Unless and until the privilege of Debtor to use inventory in the ordinary course of Debtor's business is revoked by Lender in the event of default or if Lender deems itself insecure, Debtor may use the inventory in any manner not inconsistent with this Agreement, may sell that part of the Collateral consisting of inventory provided that all such sales are in the ordinary course of business, and may use and consume any raw materials or supplies that are necessary in order to carry on Debtor's business. A sale in the ordinary course of business does not include a transfer in partial or total satisfaction of a debt.

All accounts that arise from the sale of the inventory included within the Collateral shall be subject to all of the terms and provisions hereof pertaining to accounts.

Debtor shall take all action necessary to protect and preserve the inventory.

**INSTRUMENTS.** Debtor shall immediately deliver to Lender all instruments included in the Collateral. Negotiable instruments shall be endorsed to the order of Lender. With respect to other writing(s) evidencing a right to the payment of money that, in the ordinary course of business, is transferred by delivery with any necessary endorsement or assignment, Debtor shall deliver to Lender and to any third-party issuer a document of assignment in a form and content satisfactory to Lender assigning the Debtor's rights in the said writing(s), and the third-party issuer shall acknowledge receipt of notice of the assignment.

Debtor agrees that Lender may, at any time (whether before or after default) and in its sole discretion, surrender for payment and obtain payment of any portion of the Collateral.

Any and all replacement instruments and other benefits and proceeds related to the Collateral that are received by the Debtor shall be held by Debtor in trust for lender and immediately delivered to Lender to be held as part of the Collateral.

**DEPOSIT ACCOUNTS.** Debtor shall immediately deliver to Lender all certificated certificates of deposit included in the Collateral. Negotiable certificates of deposit shall be endorsed to the order of Lender. Debtor shall execute any and all other documents necessary to provide an appropriate security interest in any account with Lender. With respect to deposit accounts held in another Bank, Debtor shall deliver to Lender a control agreement ("Control Agreement") in a form and content satisfactory to Lender assigning the Debtor's rights in the deposit account to Lender, and the Bank shall acknowledge receipt of the Control Agreement. The Control Agreement must be in a form that provides that the Bank will comply with any instruction originated by the Lender directing disposition of funds in the Deposit Account without further consent of the Debtor. The form of Control Agreement must be in a form satisfactory to the Lender, and must provide that said Bank will comply with a directive originated by the Lender and will not comply with any directive of the Debtor without the additional written consent of the Lender.

Debtor agrees that Lender may, at any time (whether before or after default) and in its sole discretion, surrender for payment and obtain payment of any portion of the Collateral, whether such have matured or the exercise of the Lender's rights results in a loss of interest or principal or other penalty on such deposits, and, in connection therewith, cause payments to be made directly to Lender.

Any and all replacement or renewal certificates and other benefits and proceeds related to the Collateral that are received by the Debtor shall be held by Debtor in trust for Lender and immediately delivered to Lender to be held as part of the Collateral.

**Exhibit "B"**    **Page 4 of 9**

Without limiting the foregoing, it is specifically understood and agreed that Lender shall have no responsibility for ascertaining any maturities or similar matters relating to any of the Collateral or for informing Debtor with respect to any such matters (irrespective of whether lender actually has, or may be deemed to have, knowledge thereof).

**INVESTMENT PROPERTY.** Immediately upon the execution of this Agreement or Debtor's acquiring rights in the Collateral, Debtor shall: (a) If the Collateral includes certificated securities to Lender and if the certificate is in registered form, register it in the name of Lender or deliver to Lender with the certificate a stock power satisfactory in form and substance to Lender. (b) If the Collateral includes uncertificated securities directly held by Debtor, transfer such securities from Debtor to Lender on the books of the issuer or cause the issuer to enter into and deliver to Lender a control agreement with Debtor and Lender, having a form and substance satisfactory to Lender, providing that issuer will comply with instructions originated by Lender without further consent of the registered owner and issuer will not follow instructions originated by Debtor without the Lender's written consent. (c) If the Collateral includes security entitlements, security accounts, or commodity accounts, cause the Lender to become the holder of the entitlements or accounts or cause the securities intermediary and/or the commodity intermediary to enter into and deliver to Lender an agreement with Debtor and Lender, in a form and substance satisfactory to Lender, providing that said intermediary will comply with entitlements or orders originated by Lender without further consent by Debtor and will not comply with orders originated by Debtor without Lender's written consent. (d) If the Collateral includes commodity contracts, cause the commodity intermediary to enter into and deliver to Lender an agreement with Debtor and Lender, in a form and substance satisfactory to Lender, that said intermediary will apply any value distributed on account of the commodity contract as directed by Lender without further consent by the commodity customer and will not comply with orders originated by Debtor without Lender's written consent.

Upon demand by Lender, Debtor shall execute, assign, and endorse all proxies, applications, acceptances, stock powers, chattel paper, documents, instruments, or other evidence of payment or writing constituting or relating to any of the Collateral, all in such form and substance as may be acceptable to Lender.

Lender shall also have a security interest in all investment property, rights, and interest of every description at any time issued or issuable as an addition to, in substitution of exchange for, or with respect to the Collateral, including, without limitation, shares issued as dividends or as the result of any reclassifications, merger, spin-off, or other reorganization. Debtor shall deliver promptly to Lender in the exact form received, any such securities or other property which come into the possession, custody, or control of Debtor, and shall with respect to such property transfer control to Lender in accord with the paragraphs above.

In its discretion and without notice to Debtor, the Lender may take any one or more of the following actions, without liability except to account for the property actually received: (a) transfer or register in its name or the name of its nominee any of the Collateral, with or without liability except to account for the property actually received; (b) transfer or register in its name or the name of its nominee any of the Collateral, with or without identification of the security interest herein created, and whether or not so transferred or registered, receive the income, dividends and other distributions thereon and hold them to apply them to the Obligations in any order of priority; (c) to the fullest extent possible under applicable law, exercise or cause to be exercised all voting and corporate powers with respect to any of the Collateral, including all rights of conversion, exchange, subscription, and any other rights, privileges, or options pertaining to such Collateral, as if the absolute owner thereof; (d) exchange any of the Collateral for other property upon a reorganization, recapitalization, or other readjustment and, in connection therewith, deposit any of the Collateral with any committee or depository upon such terms as the Lender may determine; and (e) in its absolute discretion to exercise or to withhold the exercise of any of the rights, powers, privileges, and options expressly or implicitly granted to the Lender in this Agreement, without duty to do so and without responsibility for any failure to do so or to delay in so doing.

Without limiting any other right of Lender, on default the Lender may, to the fullest extent permitted by applicable law, without notice, advertisement, hearing, or process of law of any kind, sell any or all of the Collateral, free of all rights and claims of the Debtor therein or thereto, on any recognized market or exchange at any price reasonably consistent with the market price occurring at the time of the sale of the Collateral and, notwithstanding any recent or current decreases or increases in that market price, the sale of the Collateral on such recognized market or exchange shall be deemed reasonable if conducted under ordinary terms regardless of how soon after default the Lender sells such Collateral.

**ADDITIONAL COLLATERAL.** In the event that Lender should, at any time, determine that the Collateral or Lender's security interest in the Collateral is impaired, insufficient, or has declined or may decline in value, or if Lender should deem that payment of the Obligations is insecure, time being of the very essence, then Lender may require, and Debtor agrees to furnish, additional Collateral that is satisfactory to Lender. Lender's request for additional collateral may be oral or in writing delivered by United States mail addressed to Debtor and shall not affect any other subsequent right of the Lender to request additional Collateral.

**FINANCING STATEMENT(S) AND LIEN PERFECTION.** Lender is authorized to file a conforming financing statement or statements to perfect its security interest in the Collateral, as provided in Revised Article 9, Uniform Commercial Code - Secured Transactions. Debtor agrees to provide such information, supplements, and other documents as Lender may from time to time require to supplement or amend such financing statement filings, in order to comply with applicable state or federal law and to preserve and protect the Lender's rights in the Collateral. The Debtor further grants the Lender a power of attorney to execute any and all documents necessary for the Lender to perfect or maintain perfection of its security interest in the Collateral, and to change or correct any error on any financing statement or any other document necessary for proper placement of a lien on any Collateral which is subject to this Agreement.

**LANDLORD'S WAIVER.** Upon request, Debtor shall furnish to Lender, in a form and upon such terms as are acceptable to Lender, a landlord's waiver of all liens with respect to any Collateral covered by this Agreement that is or may be located upon leased premises.

**RELATIONSHIP TO OTHER AGREEMENTS.** This Agreement and the security interests (and pledges and assignments, as applicable) herein granted are in addition to (and not in substitution, novation or discharge of) any and all prior or contemporaneous security agreements, security interest, pledges, assignments, mortgages, liens, rights, titles, or other interests in favor of Lender or assigned to Lender by others in connection with the Obligations. All rights and remedies of Lender in all such agreements are cumulative.

**TAXES, LIENS, ETC.** The Debtor agrees to pay all taxes, levies, judgments, assessments, and charges of any nature whatsoever relating to the Collateral or to the Debtor's business. If the Debtor fails to pay such taxes or other charges, the Lender, at its sole discretion, may pay such charges on behalf of the Debtor; and all sums so dispensed by the Lender, including reasonable attorneys' fees, court costs, expenses, and other charges relating thereto, shall become a part of the Obligations and shall be payable on demand.

**ENVIRONMENTAL HAZARDS.** Debtor certifies that as to any real estate which has been, is now, or will be in the future owned or occupied by Debtor, that such real estate has not in the past, nor will now or in the future be allowed in any manner to be exposed to or contain hazardous or environmentally harmful substances as may be defined or regulated by any local, state or federal law or regulation which impacts, in any way, such substances, except to the extent the existence of such substances has been presently disclosed in writing to Lender, and Debtor will immediately notify Lender in writing of any assertion made by any party to the contrary. Debtor indemnifies and holds Lender and Lender's directors, officers, employees, and agents harmless from any liability or expense of whatsoever nature, including reasonable attorneys' fees, incurred directly or indirectly as a result of Debtor's involvement with hazardous or environmentally harmful substances as may be defined or regulated as such under any local, state or federal law or regulation or Debtor's ownership or occupation of any real estate upon which any hazardous or environmentally harmful substance is or was previously located.

**PROTECTION OF COLLATERAL.** Debtor agrees that Lender may, at Lender's sole option, whether before or after any event of default, and without prior notice to Debtor, take the following actions to protect Lender's interest in the Collateral: (a) pay for the maintenance, preservation, repair, improvement, or testing of the Collateral; (b) pay any filing, recording, registration, licensing, certification, or other fees and charges related to the Collateral; or (c) take any other action to preserve and protect the Collateral or Lender's rights and remedies under this Agreement, as Lender may deem necessary or appropriate from time to time. Debtor agrees that Lender is not obligated and has no duty whatsoever to take the foregoing actions. Debtor further agrees to reimburse Lender promptly upon demand for any payment made or any expenses incurred by Lender pursuant to this authorization. Payments and expenditures made by Lender under this authorization shall constitute additional Obligations, shall be secured by this Agreement, and shall bear interest thereon from the date incurred at the maximum rate of interest, including any default rate, if one is provided, as set forth in the notes secured by this obligation.

**INFORMATION AND REPORTING.** The Debtor agrees to supply to the Lender such financial and other information concerning its affairs and the status of any of its assets as the Lender, from time to time, may reasonably request. The Debtor further agrees to permit the Lender, its employees, and agents, to have access to the Collateral for the purpose of inspecting it, together with all of the Debtor's other physical assets, if any, and to permit the Lender, from time to time, to verify Accounts, if any, as well as to inspect, copy, and to examine the books, records, and files of the Debtor.

**CROSS-COLLATERALIZATION.** Debtor agrees that any security interest provided in Collateral under this Agreement or any Collateral provided in connection with any and all other indebtedness of Debtor to Lender, whether or not such indebtedness is related by class or claim and whether or not contemplated by the parties at the time of executing each evidence of indebtedness, shall act as Collateral for all said indebtedness. This cross-collateralization provision shall not apply to any Collateral that is/are household goods or a principal dwelling.

**DEFAULT.** The occurrence of any of the following events shall constitute a default of this Agreement: (a) the non-payment, when due (whether by acceleration of maturity or otherwise), of any amount payable on any of the Obligations or any extension or renewal thereof; (b) the failure to perform any agreement of the Debtor contained herein or in any other agreement Debtor has or may have with Lender; (c) the publication of any statement, representation, or warranty, whether written or oral, by the Debtor to the Lender, which at any time is untrue in any respect as of the date made; (d) the condition that any Debtor becomes insolvent or unable to pay debts as they mature, or makes an assignment for the benefit of the Debtor's creditors, or conveys substantially all of its assets, or in the event of any proceedings instituted by or against any Debtor alleging that such Debtor is insolvent or unable to pay debts as they mature (failure to pay being conclusive evidence of inability to pay); (e) Debtor makes application for appointment of a receiver or any other legal custodian, or in the event that a petition of any kind is filed under the Federal Bankruptcy Code by or against such Debtor and the resulting proceeding is not discharged within thirty days after filing; (f) the entry of any judgment against any Debtor, or the issue of any order of attachment, execution, sequestration, claim and delivery, or other order in the nature of a writ levied against the Collateral; (g) the death of any Debtor who is a natural person, or of any partner of the Debtor which is a partnership; (h) the dissolution, liquidation, suspension of normal business, termination of existence, business failure, merger, or consolidation or transfer of a substantial part of the property of any Debtor which is a corporation, limited liability company, partnership or other non-individual business entity; (i) the Collateral or any part of the Collateral declines in value in excess of normal wear, tear, and depreciation or becomes, in the judgment of Lender, impaired, unsatisfactory, or insufficient in character or value, including but not limited to the filing of a competing financing statement; breach of warranty that the Debtor is the owner of the Collateral free and clear of any encumbrances (other than those encumbrances disclosed by Debtor or otherwise made known to Lender, and which were acceptable to Lender at the time); sale of the Collateral (except in the ordinary course of business) without Lender's express written consent; failure to keep the Collateral insured as provided herein; failure to allow Lender to inspect the Collateral upon demand or at reasonable time; failure to make prompt payment of taxes on the Collateral; loss, theft, substantial damage, or destruction of the Collateral; and, when Collateral includes inventory, accounts, chattel paper, or instruments, failure of account debtors to pay their obligations in due course; or (j) the Lender in good faith, believes the Debtor's ability to repay the Debtor's indebtedness secured by this Agreement, any Collateral, or the Lender's ability to resort to any Collateral, is or soon will be impaired, time being of the very essence.

**REMEDY.** Upon the occurrence of an event of default, Lender, at its option, shall be entitled to exercise any one or more of the remedies described in this Agreement, in all documents evidencing the Obligations, in any other agreements executed by or delivered by Debtor for benefit of Lender, in any third-party security agreement, mortgage, pledge, or guaranty relating to the Obligations, in the Uniform Commercial Code of the state in which Collateral is located, and all remedies at law and equity, all of which shall be deemed cumulative. The Debtor agrees that, whenever a default exists, all Obligations may (notwithstanding any provision in any other agreement), at the sole option and discretion of the Lender and without demand or notice of any kind, be declared, and thereupon immediately shall become due and payable; and the Lender

© 2004-2015 Compliance Systems, Inc. 9621ecce-134dd32d - 2015.12.2.331
Commercial - Security Agreement DL4008                                Page 6 of 9                                www.compliancesystems.com

Initials *DRB*

may exercise, from time to time, any rights and remedies, including the right to immediate possession of the Collateral, available to it under applicable law. The Debtor agrees, in the case of default, to assemble, at its own expense, all Collateral at a convenient place acceptable to the Lender. The Lender shall, in the event of any default, have the right to take possession of and remove the Collateral, with or without process of law, and in doing so, may peacefully enter any premises where the Collateral may be located for such purpose. Debtor waives any right that Debtor may have, in such instance, to a judicial hearing prior to such retaking. The Lender shall have the right to hold any property then in or upon said Collateral at the time of repossession not covered by the security agreement until return is demanded in writing by Debtor. Debtor agrees to pay all reasonable costs of the Lender in connection with the collecting of the Obligations and enforcement of any rights connected with retaking, holding, testing, repairing, improving, selling, leasing, or disposing of the Collateral, or like expenses. These expenses, together with interest thereon from the date incurred until paid by Debtor at the maximum post-default rate stated in the notes secured hereby, which Debtor agrees to pay, shall constitute additional Obligations and shall be secured by and entitled to the benefits of this Agreement. The Lender may sell, lease, or otherwise dispose of the Collateral, by public or private proceedings, for cash or credit, without assumption of credit risk. Unless the Collateral is perishable or threatens to decline speedily in value or of a type customarily sold on a recognized market, Lender will send Debtor reasonable notice of the time and place of any public sale or of the time after which any private sale or other disposition will be made. Any notification of intended disposition of the Collateral by the Lender shall be deemed to be reasonable and proper if sent United States mail, postage prepaid, electronic mail, facsimile, overnight delivery or other commercially reasonable means to the Debtor at least ten (10) days before such disposition, and addressed to the Debtor either at the address shown herein or at any other address provided to Lender in writing for the purpose of providing notice. Proceeds received by Lender from disposition of the Collateral may be applied toward Lender's expenses and other obligations in such order or manner as Lender may elect. Debtor shall be entitled to any surplus if one results after lawful application of the proceeds. If the proceeds from a sale of the Collateral are insufficient to extinguish the Obligations of the Debtor hereunder, Debtor shall be liable for a deficiency. Lender shall have the right, whether before or after default, to collect and receipt for, compound, compromise, and settle, and give releases, discharges, and acquittances with respect to, any and all amounts owed by any person or entity with respect to the Collateral. Lender may remedy any default and may waive any default without waiving the default remedied and without waiving any other prior or subsequent default. The rights and remedies of the Lender are cumulative, and the exercise of any one or more of the rights or remedies shall not be deemed an election of rights or remedies or a waiver of any other right or remedy.

**FUTURE ADVANCES AND AFTER-ACQUIRED PROPERTY.** Future advances may be made at any time by the Lender under this Agreement to the extent allowed by law. The security interest grant contained in this Agreement also applies to any Collateral of the type(s) identified in this Agreement that the Debtor acquires after this Agreement is executed, except that no security interest attaches to after-acquired consumer goods unless the Debtor acquires rights in such goods within 10 days of Lender giving value. In anticipation of future advances by Lender, the Debtor authorizes Lender to file any necessary financing statements to protect Lender's security interest.

**EXERCISE OF LENDER'S RIGHTS.** Any delay on the part of the Lender in exercising any power, privilege, or right hereunder, or under any other document executed by Debtor to the Lender in connection herewith, shall not operate as a waiver thereof, and no single or partial exercise thereof or any other power, privilege, or right shall preclude other or further exercise thereof. The waiver by the Lender of any default of the Debtor shall not constitute a waiver of subsequent default.

**CONTINUING AGREEMENT.** This is a continuing agreement and the security interest (and pledge and assignment, as applicable) hereby granted and all of the terms and provisions of this Agreement shall be deemed a continuing agreement and shall remain in full force and effect until the Obligations are paid in full. In the event that Lender should take additional Collateral, or enter into other security agreements, mortgages, guarantees, assignments, or similar documents with respect to the Obligations, or should Lender enter into other such agreements with respect to other obligations of Debtor, such agreements shall not discharge this Agreement, which shall be construed as cumulative and continuing and not alternative and exclusive.

Any attempted revocation or termination shall only be effective if explicitly confirmed in a signed writing issued by Lender to such effect and shall in no way impair or affect any transactions entered into or rights created or liabilities incurred or arising prior to such revocation or termination, as to which this Agreement shall be truly operative until same are repaid and discharged in full. Unless otherwise required by applicable law, Lender shall be under no obligation to issue a termination statement or similar document unless Debtor requests same in writing, and providing further, that all Obligations have been repaid and discharged in full and there are no commitments to make advances, incur any obligations, or otherwise give value.

**ABSENCE OF CONDITIONS OF LIABILITY.** This Agreement is unconditional. Lender shall not be required to exhaust its remedies against Debtor, other collateral, or guarantors, or pursue any other remedies within Lender's power before being entitled to exercise its remedies hereunder. Lender's rights to the Collateral shall not be altered by the lack of validity or enforceability of the Obligations against Debtor, and this Agreement shall be fully enforceable irrespective of any counterclaim which the Debtor may assert on the underlying debt and notwithstanding any stay, modification, discharge, or extension of Debtor's Obligation arising by virtue of Debtor's insolvency, bankruptcy, or reorganization, whether occurring with or without Lender's consent.

**NOTICES.** Any notice or demand given by Lender to Debtor in connection with this Agreement, the Collateral, or the Obligations, shall be deemed given and effective upon deposit in the United States mail, postage prepaid, electronic mail, facsimile, overnight delivery or other commercially reasonable means addressed to Debtor at the address designated at the beginning of this Agreement, or such other address as Debtor may provide to Lender in writing from time to time for such purposes. Actual notice to Debtor shall always be effective no matter how such notice is given or received.

**WAIVERS.** Debtor waives notice of Lender's acceptance of this Agreement, defenses based on suretyship, and to the fullest extent permitted by law, any defense arising as a result of any election by Lender under the Bankruptcy Code or the Uniform Commercial Code. Debtor and any maker, endorser, guarantor, surety, third-party pledgor, and other party executing this Agreement that is liable in any capacity with respect to the

Obligations hereby waive demand, notice of intention to accelerate, notice of acceleration, notice of nonpayment, presentment, protest, notice of dishonor, and any other similar notice whatsoever.

**JOINT AND SEVERAL LIABILITY.** To the extent permitted by law, each Debtor executing this Agreement is jointly and severally bound.

**SEVERABILITY.** Whenever possible, each provision of this Agreement shall be interpreted in such manner as to be effective and valid under applicable law; but, in the event any provision of this Agreement shall be prohibited by or invalid under applicable law, such provision shall be ineffective to the extent of such prohibition or invalidity and shall be severed from the rest of this Agreement without invalidating the remainder of such provision or the remaining provisions of this Agreement.

**SURVIVAL.** The rights and privileges of the Lender hereunder shall inure to the benefits of its successors and assigns, and this Agreement shall be binding on all heirs, executors, administrators, assigns, and successors of Debtor.

**ASSIGNABILITY.** Lender may assign, pledge, or otherwise transfer this Agreement or any of its rights and powers under this Agreement without notice, with all or any of the Obligations, and in such event the assignee shall have the same rights as if originally named herein in place of Lender. Debtor may not assign this Agreement or any benefit accruing to it hereunder without the express written consent of the Lender.

**AUTHORIZATIONS.** Debtor authorizes Lender, without notice or demand and without altering Debtor's liability or Lender's rights hereunder, from time to time to take acts which may alter the Obligation of Debtor to Lender or Debtor's right to restitution or subrogation or both, including to the extent allowed by law:

(a) Renewing, compromising, extending, or otherwise changing the time for payment of, or otherwise changing the terms of the Obligations or any part thereof, including increasing the rate of interest;

(b) Extending additional credit to Debtor in any manner for any purpose;

(c) Incurring costs, including attorneys' fees, with respect to enforcing Lender's rights with respect to the Obligations, and Collateral securing the Obligations;

(d) Exchanging, enforcing, waiving, or releasing (whether intentionally or unintentionally) any security for the Obligations or any part thereof or purchase such security at private or public sale and to file any financing statements necessary for Lender to perfect or protect Lender's security interest;

(e) Settling, releasing, compromising with, or substituting any one or more endorsers, guarantors, or other obligors or the Obligations;

(f) Impairing the value of Lender's interest in Collateral through failure to obtain or maintain protection, failure to obtain or maintain recordation of an interest, or through failure to perform a duty owed to Debtor to preserve the Collateral; and

(g) Applying all monies received from Debtor and others or from Collateral in Lender's discretion without in any way being required to marshal assets.

**GOVERNING LAW.** This Agreement has been delivered in the State of Iowa and shall be construed in accordance with the laws of that state.

**HEADINGS AND GENDER.** The headings preceding text in this Agreement are for general convenience in identifying subject matter, but have no limiting impact on the text which follows any particular heading. All words used in this Agreement shall be construed to be of such gender or number as the circumstances require.

**MISCELLANEOUS.** Time is of the essence of this Agreement. Except as otherwise defined in this Agreement, all terms herein shall have the meanings provided by the Uniform Commercial Code as it has been adopted in the state of Iowa. All rights, remedies, and powers of the Lender hereunder are irrevocable and cumulative, and not alternative or exclusive, and shall be in addition to all rights, remedies, and powers given hereunder or in or by any other instruments or by the provision of the Uniform Commercial Code as adopted in the state where the Lender is located, or any other laws, now existing or hereafter enacted. The Debtor specifically agrees that, if it has heretofore or hereafter executed any loan agreement in conjunction with the Agreement, any ambiguities between this Agreement and any such loan agreement shall be construed under the provisions of the loan agreement, to the extent that it may be necessary to eliminate any such ambiguity. Debtor releases Lender from any liability which might otherwise exist for any act or omission of Lender related to the collection of any debt secured by this Agreement or the disposal of any Collateral, except for the Lender's willful misconduct.

**ORAL AGREEMENTS DISCLAIMER. IMPORTANT: READ BEFORE SIGNING. THE TERMS OF THIS AGREEMENT SHOULD BE READ CAREFULLY BECAUSE ONLY THOSE TERMS IN WRITING ARE ENFORCEABLE. NO OTHER TERMS OR ORAL PROMISES NOT CONTAINED IN THIS WRITTEN CONTRACT MAY BE LEGALLY ENFORCED. THE TERMS OF THIS AGREEMENT MAY BE CHANGED ONLY BY ANOTHER WRITTEN AGREEMENT.**

**ACKNOWLEDGMENT.** Debtor acknowledges agreeing to all of the provisions in this Agreement, and further acknowledges receipt of a true and complete copy of this Agreement.

IN WITNESS WHEREOF, Debtor has executed this Agreement on the date and year shown below.

PEARL CITY GARAGE, INC.

By: DOUGLAS R BUSTER        4/11/2016
                             Date
Its: President

© 2004-2015 Compliance Systems, Inc. 9821ecce-134da32d - 2015.12.2.331
Commercial - Security Agreement DL4008        Page 8 of 9        www.compliancesystems.com

Initials DDR

**Exhibit "B"**                                    **Page 8 of 9**

**LENDER:** Northwest Bank & Trust Company

By: Christopher Heller                    Date
Its: Senior Vice President Senior Loan Officer

## UCC FINANCING STATEMENT
FOLLOW INSTRUCTIONS

X17032401-6

**FILED
SECRETARY OF STATE
IOWA**

**2017-10-26 07:32**

A. NAME & PHONE OF CONTACT AT FILER (optional)
Corporation Service Company, phone:800-858-5294, fax:800-345-6059

B. E-MAIL CONTACT AT FILER (optional)

C. SEND ACKNOWLEDGEMENT TO: (Name and Address)

Corporation Service Company
801 Adlai Stevenson Dr
Springfield, IL  62703

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

DEBTOR'S NAME: Provide only one Debtor name - use exact, full name; do not omit, modify, or abbreviate any part of the debtor's name

| ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| PEARL CITY GARAGE, INC. | | | | |
| INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| 3206 Hershey Ave Building F | Muscatine | IA | 52761 | USA |

SECURED PARTY'S NAME (or NAME of ASSIGENEE of ASSIGNOR SECURED PARTY): Provide only one Secured Party name

| ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| CHTD COMPANY | | | | |
| INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| P.O. BOX 2576 | Springfield | IL | 62708 | USA |

COLLATERAL: This financing statement covers the following collateral:

All of Debtor's right, title and interest, whether now existing or hereafter acquired, in and to any and all assets of the Debtor. THE SECURED PARTY NAMED IN THIS RECORD IS ACTING IN A REPRESENTATIVE CAPACITY FOR PURPOSES OF FORWARDING NOTICES AND INQUIRIES REGARDING THIS RECORD. FOR MORE INFORMATION, PLEASE CONTACT THE SECURED PARTY AT THE ADDRESS LISTED ABOVE OR AT UCCSPREP@CSCINFO.COM.

Check only if applicable and check only one box: Collateral is: ☐ held in a Trust ☐ being administered by a Decedent's Personal Representative

Check only if applicable and check only one box:
☐ Public-Finance Transaction ☐ Manufactured-Home Transaction ☐ A Debtor is a Transmitting Utility

Check only if applicable and check only one box:
☐ Agricultural Lien ☐ Non-UCC Filing

ALTERNATIVE DESIGNATION (if applicable): ☐ Lessee/Lessor ☐ Consignee/Consignor ☐ Seller/Buyer ☐ Bailee/Bailor ☐ Licensee/Licensor

OPTIONAL FILER REFERENCE DATA
[137958547]

☐ This FINANCING STATEMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS (if applicable)

This FINANCING STATEMENT:
☐ covers timber to be cut ☐ covers as-extracted collateral ☐ is filed as a fixture filing

Name and address of a RECORD OWNER of real estate described (if Debtor does not have a record interest):

Description of real estate:

MISCELLANEOUS

# **ondeck**

# BUSINESS LOAN AND SECURITY AGREEMENT SUPPLEMENT

*This Business Loan and Security Agreement Supplement is part of (and incorporated by reference into) the Business Loan and Security Agreement. Borrower should keep this important legal document for Borrower's records.*

| YOUR LOAN DETAILS | |
|---|---|
| **Borrower:** | **PEARL CITY GARAGE, INC.** |
| **Lender:** | **On Deck Capital, Inc.** |
| **Loan Amount:** | **$155,000.00** |
| **Origination Fee:** (Deducted at time of disbursement) | **$3,875.00**  + fee 120.34  Debit @ 3995.34 |
| **Disbursement Amount:** (Loan Amount less Origination Fee) Note that the Disbursement Amount may not be the amount deposited to your Designated Checking Account. The amount that will be deposited to your Designated Checking Account will be reduced by any amounts owed to Lender from a prior loan or used to pay off an amount owed to a third party lender. | **$151,125.00** |
| **Daily Payment Amount:** (Business days only) | **$557.67** |
| **Number of Daily Payments:** (Business days only) | **378** |
| **Payment Schedule:** "Business day" means any Monday through Friday except for Federal Reserve holidays. | **378** payments of **$557.67** due each Business day (in the case of loans with a Daily Payment Amount) or each Wednesday (in the case of loans with a Weekly Payment Amount) in each case immediately following the date the Disbursement Amount is disbursed by Lender. |
| **Total Interest Expense:** (Does not include any Fees) | **$55,799.26**  +3875 = 59,675 |
| **Total Repayment Amount:** (Loan Amount plus Total Interest Expense) | **$210,799.26** |
| PREPAYMENT, RENEWAL, AND OTHER FEES | |
| **Prepayment:** (See Section 10 of the Business Loan and Security Agreement for specific details) | A "Prepayment Interest Reduction Percentage" of 25% (with respect to unpaid interest remaining on this Loan) will be applied to the extent that the Borrower prepays this Loan in whole in accordance with, and subject to, Section 10 of the Business Loan and Security Agreement. Note that 75% of remaining unpaid interest will still be due upon Prepayment in whole. You should keep in mind that partial prepayments will not reduce the Total Interest Expense. |
| **Renewals:** | Remaining unpaid interest on this Loan will be eligible to be forgiven by Lender if: (i) Borrower is current on its scheduled payments with respect to this Loan and, (ii) while this Loan is outstanding, Borrower enters into a business loan and security agreement for a new qualifying term loan with Lender, a portion of the proceeds of which is used to repay this Loan in whole. |
| **Other Fees:** | Returned Payment Fee: **$25.00** Late Fee: **$10.00** (maximum $50 within any 20 day period) |

If you have any questions, please call us at 1.888.828.5717 (we have support available Monday - Friday 8am - 8pm EST and Saturdays 8:30am - 5:30pm EST) or email support@ondeck.com.

**Exhibit "D"**                                           **Page 1 of 16**



# BUSINESS LOAN AND SECURITY AGREEMENT SUPPLEMENT

**SMART**BOX™

Capital Comparison Tool

This tool is provided to help you understand and assess the cost of your small business financing.

*The calculations below involve certain key assumptions about this Loan, including that the Loan is paid off in its entirety according to the agreed payment schedule and that no repayments are missed.*

| Loan Amount | Disbursement Amount (minus fees withheld) ¹ | Repayment Amount | Term |
|---|---|---|---|
| **$155,000.00** | **$151,125.00** | **$210,799.26** | **18 Months** (repaid Daily) |

| METRIC | METRIC CALCULATION | | METRIC EXPLANATION |
|---|---|---|---|
| **Total Cost of Capital** $59,674.26 | Interest Expense: | $55,799.26 | This is the total amount that you will pay in interest or Loan Fees and other fees for the Loan. The amount does not include fees and other charges you can avoid, such as late payment fees and returned payment fees.² |
| | Loan Fee: | $0.00 | |
| | Origination Fee: | $3,875.00 | |
| | Other Fees: | $0.00 | |
| | **Total Cost of Capital:** | **$59,674.26** | |
| **Annual Percentage Rate (APR)** ³ 47.04% | Your Loan will have Daily payments of: | $557.67 | This is the cost of the Loan – including total interest or Loan Fees and other fees – expressed as a yearly rate. APR takes into account the amount and timing of capital you receive, fees you pay, and the periodic payments you make. While APR can be used for comparison purposes, it is not an interest rate and is not used to calculate your interest expense or Loan Fee. |
| | APR: | 47.04% | |
| **Average Monthly Payment** $11,711.07 | Repayment Amount: | $210,799.26 | This is the average monthly repayment amount of the Loan, which does not include fees and other charges you can avoid, such as late payment fees and returned payment fees.² The actual repayment frequency for the Loan will be Daily. This is an estimate for comparison purposes only. |
| | Term (in months): | ÷ 18 Months | |
| | **Average Monthly Payment:** | **$11,711.07** | |
| **Cents on the Dollar** *(excluding fees)* 36.0¢ | Interest Expense or Loan Fee: | $55,799.26 | This is the total amount of interest or Loan Fee paid per dollar borrowed. This amount is exclusive of fees. |
| | Loan Amount: | ÷ $155,000.00 | |
| | **Cents on the Dollar** *(excluding fees):* | **36.0¢** | |
| **Prepayment** | Does prepayment of this Loan result in any new fees or charges? | | **No** (see "Prepayment" above) |
| | Does prepayment of this Loan decrease the total interest or Loan Fees owed? | | **Yes** (see "Prepayment" above for the interest or fee reduction amount) |

¹ The Disbursement Amount is the amount of capital that a business receives and may be different from the Loan Amount. The Disbursement Amount is net of fees withheld from the Loan Amount. A portion of the Disbursement Amount may be used to pay off any amounts owed from a prior loan or an amount owed to a third party.

² Your business may incur other fees that are not a condition of borrowing, such as late payment fees, returned payment fees, or monthly maintenance fees. Those fees are not reflected here. See the agreement for details on these fees (see "Other Fees" above).

³ APR should be considered in conjunction with the Total Cost of Capital. APR may be most useful when comparing financing solutions of similar expected duration. APR is calculated here according to the principles of 12 C.F.R. § 1026 (Regulation Z), using 52 payment periods of equal length and 52 payment dates per year for weekly pay products, and 252 payment dates per year for daily pay products.

© 2016 Innovative Lending Platform Association. All rights reserved. Innovative Lending Platform Association is not responsible for any misuse of the SMART Box™ or any inaccuracies in the calculations or information included therein.

**Exhibit "D"**

**Page 2 of 16**

# ondeck

**BUSINESS LOAN AND SECURITY
AGREEMENT SUPPLEMENT**

| CERTAIN DISCLOSURES | |
|---|---|
| **Loan Pricing Disclosure** | Lender uses a system of risk-based pricing to determine interest charges and fees. Risk-based pricing is a system that evaluates the risk factors of your application and adjusts the interest rate up or down based on this risk evaluation. Although Lender believes that its loan process provides expedited turnaround time and efficient access to capital, this loan may be a higher cost loan than loans that may be available through other lenders. |
| **Loan For Specific Purposes Only** | The proceeds of the requested Loan may solely be used for the specific purposes as set forth in the Use of Proceeds Certification of the Business Loan and Security Agreement. IN ADDITION, THE LOAN WILL NOT BE USED FOR PERSONAL, FAMILY OR HOUSEHOLD PURPOSES. Borrower understands that Borrower's agreement not to use the Loan proceeds for personal, family or household purposes means that certain important duties imposed upon entities making loans for consumer/personal purposes, and certain important rights conferred upon consumers, pursuant to federal or state law will not apply to this transaction. |

**Exhibit "D"**                                    **Page 3 of 16**

# ondeck

## BUSINESS LOAN AND SECURITY AGREEMENT

**1. INTRODUCTION.** This Business Loan and Security Agreement (together with the accompanying Business Loan and Security Agreement Supplement and the accompanying Authorization Agreement for Direct Deposit (ACH Credit) and Direct Payments (ACH Debits), this "Agreement") governs your business loan ("Loan") from On Deck Capital, Inc. Please read it and keep it for your reference. In this Agreement, the words "you," "your" and "Borrower" mean the Borrower identified on the signature page of this Business Loan and Security Agreement. Each Guarantor identified on the signature page of this Business Loan and Security Agreement shall be referred to individually as "Guarantor" and collectively as "Guarantors" in this Agreement. The words "Lender", "we", "us", and "our" mean On Deck Capital, Inc. or its successor(s) and assign(s).

**2. EFFECTIVE DATE.** This Agreement begins on the date we accept this Agreement in Virginia. Borrower understands and agrees that Lender may postpone, without penalty, the disbursement of amounts to Borrower until all required security interests have been perfected and Lender has received all required personal guarantees or other documentation.

**3. AUTHORIZATION.** Borrower agrees that the Loan made by Lender to Borrower shall be conclusively deemed to have been authorized by Borrower and to have been made pursuant to a duly authorized request on its behalf.

**4. LOAN FOR SPECIFIC PURPOSES ONLY.** The proceeds of the requested Loan may solely be used for the specific purposes as set forth in the Use of Proceeds Certification contained in Section 50 below, and not for any other purposes. In addition, the Loan will not be used for personal, family or household purposes, and Borrower and Guarantors are forever estopped from taking the position that such Loan (including Advances) are or were used for such personal, family or household purposes. **Borrower understands that Borrower's agreement not to use the Loan proceeds for personal, family or household purposes means that certain important duties imposed upon entities making loans for personal, family or household purposes, and certain important rights conferred upon such persons, pursuant to federal or state law will not apply to the Loan or the Agreement. Borrower also understands that Lender will be unable to confirm whether the use of the Loan conforms to this section. Borrower agrees that a breach by Borrower of the provisions of this section will not affect Lender's right to (i) enforce Borrower's promise to pay for all amounts owed under this Agreement, regardless of the purpose for which the Loan is in fact obtained or (ii) use any remedy legally available to Lender, even if that** remedy would not have been available had the Loan been made for personal, family or household purposes.

**5. DISBURSEMENT OF LOAN PROCEEDS AND MAINTENANCE OF BORROWER'S BANK ACCOUNT.** If Borrower applied and was approved for a Loan, Borrower's Loan will be disbursed upon approval as provided in the accompanying Authorization Agreement for Direct Deposit (ACH Credit) and Direct Payments (ACH Debits). Borrower agrees to maintain Direct Payments (ACH Debits) in its operating account which is the account that was reviewed in conjunction with underwriting and approval of this Loan (including keeping such account open until the Total Repayment Amount had been completely repaid).

**6. PROMISE TO PAY.** Borrower agrees to pay Lender the Total Repayment Amount shown in the accompanying Business Loan and Security Agreement Supplement in accordance with the Payment Schedule shown in the accompanying Business Loan and Security Agreement Supplement. Borrower agrees to enroll in Lender's Automatic Payment Plan and authorizes Lender to collect required payments as provided in the accompanying Authorization Agreement for Direct Deposit (ACH Credit) and Direct Payments (ACH Debits). If required by Lender, Borrower further agrees and authorizes Lender or its servicer to collect required payments from a transfer account established pursuant to certain Transfer Account Loan Documentation that will be provided by Lender in connection with this Business Loan and Security Agreement if applicable.

**7. ALTERNATIVE PAYMENT METHODS.** If Borrower knows that for any reason Lender will be unable to process a payment under Lender's Automatic Payment Plan, then Borrower must either restore sufficient funds such that the missed payment can be collected as provided in the accompanying Authorization Agreement for Direct Deposit (ACH Credit) and Direct Payments (ACH Debits), or promptly mail or deliver a check to Lender in the amount of the missed payment or, if offered, make the missed payment by any pay-by-phone or on-line service that Lender may make available from time to time. If Borrower elects to send payments on Borrower's Account by postal mail, then Borrower agrees to send such payments to On Deck Capital, 901 N Stuart Street, Suite 700, Arlington, VA 22203, Attn: Director of Operations. All alternative payments must be made in good funds by check, money order, wire transfer, automatic transfer from an account at an institution offering such service, or other instrument in U.S. Dollars. Borrower understands and agrees that payments made at any other address than as specified by Lender may result in a delay in processing and/or crediting. If Borrower makes an alternative payment on Borrower's Loan by mail or by any pay-by-phone or on-line service that

**Exhibit "D"**

# ondeck

## BUSINESS LOAN AND SECURITY AGREEMENT

Lender makes available while Borrower is enrolled in the Automatic Payment Plan, Lender may treat such payment as an additional payment and continue to process Borrower's scheduled Automatic Payment Plan payments or may reduce any scheduled Automatic Payment Plan payment by the amount of any such additional payment received.

**8. APPLICATION OF PAYMENTS.** Subject to applicable law, Lender reserves the right to allocate and apply payments received on Borrower's Loan between principal, interest and fees in any manner Lender chooses in Lender's sole discretion it being understood and agreed that any fees and interest will generally be paid during the earlier portion of the term.

**9. POSTDATED CHECKS, RESTRICTED ENDORSEMENT CHECKS AND OTHER DISPUTED OR QUALIFIED PAYMENTS.** Lender can accept late, postdated or partial payments without losing any of Lender's rights under this Agreement (a postdated check is a check dated later than the day it was actually presented for payment). Lender is under no obligation to hold a postdated check and Lender reserves the right to process every item presented as if dated the same date received by Lender or Lender's check processor unless Borrower gives Lender adequate notice and a reasonable opportunity to act on it. Except where such notice and opportunity is given, Borrower may not hold Lender liable for depositing any postdated check. **Borrower agrees not to send Lender partial payments marked "paid in full," "without recourse," or similar language. If Borrower sends such a payment, Lender may accept it without losing any of Lender's rights under this Agreement. All notices and written communications concerning postdated checks, restricted endorsement checks (including any check or other payment instrument that indicates that the payment constitutes "payment in full" of the amount owed or that is tendered with other conditions or limitations or as full satisfaction of a disputed amount) or any other disputed, nonconforming or qualified payments, must be mailed or delivered to On Deck Capital, Client Service, 901 N Stuart Street, Suite 700, Arlington, VA 22203, Attn: Director of Operations.**

**10. PREPAYMENT.** Borrower may prepay Borrower's Loan in whole on any Business day by paying Lender the sum total of the Total Repayment Amount, any Returned Payment Fees, and any Late Fees, in each case as described in the accompanying Business Loan and Security Agreement Supplement less (i) the amount of any Loan payments made prior to such prepayment and (ii) the product of (x) the percentage identified as the applicable Prepayment Interest Reduction Percentage in the accompanying Business Loan and Security Agreement Supplement; and (y) the aggregate amount of unpaid

interest remaining on the Borrower's Loan as of such date as determined by Lender's records in accordance with Section 8. Borrower may prepay Borrower's Loan in part on any Business day and such payment shall be applied against the Total Repayment Amount, any Returned Payment Fees, and any Late Fees, in each case as described in the accompanying Business Loan and Security Agreement Supplement.

**11. SECURITY INTEREST**. Borrower hereby grants to Lender, the secured party hereunder, a continuing security interest in and to any and all "Collateral" as described below to secure payment and performance of all debts, liabilities and obligations of Borrower to Lender hereunder and also any and all other debts, liabilities and obligations of Borrower to Lender of every kind and description, direct or indirect, absolute or contingent, primary or secondary, due or to become due, now existing or hereafter arising, related to the Loan described in this Agreement, whether or not contemplated by the parties at the time of the granting of this security interest, regardless of how they arise or by what agreement or instrument they may be evidenced or whether evidenced by any agreement or instrument, and includes obligations to perform acts and refrain from taking action as well as obligations to pay money including, without limitation, all interest, other fees and expenses (all hereinafter called "Obligations"). The Collateral includes the following property that Borrower (or Guarantor, if applicable, pursuant to Section 12) now owns or shall acquire or create immediately upon the acquisition or creation thereof: (i) any and all amounts owing to Borrower now or in the future from any merchant processor(s) processing charges made by customers of Borrower via credit card or debit card transactions; and (ii) all other tangible and intangible personal property, including, but not limited to (a) cash and cash equivalents, (b) inventory, (c) equipment, (d) investment property, including certificated and uncertificated securities, securities accounts, security entitlements, commodity contracts and commodity accounts, (e) instruments, including promissory notes (f) chattel paper, including tangible chattel paper and electronic chattel paper, (g) documents, (h) letter of credit rights, (i) accounts, including health-care insurance receivables, (j) deposit accounts, (k) commercial tort claims, (l) general intangibles, including payment intangibles and software and (m) as-extracted collateral as such terms may from time to time be defined in the Uniform Commercial Code. The security interest Borrower (or Guarantor, if applicable, pursuant to Section 12) grants includes all accessions, attachments, accessories, parts, supplies and replacements for the Collateral, all products, proceeds and collections thereof and all records and data relating thereto. Lender disclaims any security interest in household goods in which Lender is forbidden by law from taking a security interest.

**Exhibit "D"**                    **Page 5 of 16**

# ondeck

**12. PROTECTING THE SECURITY INTEREST.** Borrower agrees that Lender and/or Lender's Representative may file any financing statement, lien entry form or other document Lender and/or Lender's Representative requires in order to perfect, amend or continue Lender's security interest in the Collateral and Borrower agrees to cooperate with Lender and Lender's Representative as may be necessary to accomplish said filing and to do whatever Lender and Lender's Representative deems necessary to protect Lender's security interest in the Collateral. Borrower and Guarantor each agree that, if any Guarantor is a corporate entity, then Lender or Lender's Representative may file any financing statement, lien entry form or other document against such Guarantor or its property that Lender and/or Lender's Representative requires in order to perfect, amend or continue Lender's security interest in the Collateral. Any such Guarantor agrees to cooperate with Lender and Lender's Representative as may be necessary to accomplish said filing and to do whatever Lender or Lender's Representative deems necessary to protect Lender's security interest in the Collateral. In this Agreement, "Lender's Representative" means any entity or individual that is designated by Lender to serve in such capacity.

**13. LOCATION OF COLLATERAL; TRANSACTIONS INVOLVING COLLATERAL.** Unless Lender has agreed otherwise in writing, Borrower agrees and warrants that (i) all Collateral (or records of the Collateral in the case of accounts, chattel paper and general intangibles) shall be located at Borrower's address as shown in the application, (ii) except for inventory sold or accounts collected in the ordinary course of Borrower's business, Borrower shall not sell, offer to sell, or otherwise transfer or dispose of the Collateral, (iii) no one else has any interest in or claim against the Collateral that Borrower has not already told Lender about, (iv) Borrower shall not pledge, mortgage, encumber or otherwise permit the Collateral to be subject to any lien, security interest, encumbrance or charge, other than the security interest provided for in this Agreement and (v) Borrower shall not sell, offer to sell, or otherwise transfer or dispose of the Collateral for less than the fair market value thereof. Borrower shall defend Lender's rights in the Collateral against the claims and demands of all other persons. All proceeds from any unauthorized disposition of the Collateral shall be held in trust for Lender, shall not be co-mingled with any other funds and shall immediately be delivered to Lender. This requirement, however, does not constitute consent by Lender to any such disposition.

**14. TAXES, ASSESSMENTS AND LIENS.** Borrower will complete and file all necessary federal, state and local tax returns and will pay when due all taxes, assessments, levies and liens upon the Collateral and provide evidence of such payments to Lender upon request.

**15. INSURANCE.** Borrower shall procure and maintain such insurance as Lender may require with respect to the Collateral, in form, amounts and coverage reasonably acceptable to Lender and issued by a company reasonably acceptable to Lender naming Lender as loss payee. If Borrower at any time fails to obtain or maintain any insurance as required under this Agreement, Lender may obtain such insurance as Lender deems appropriate at Borrower's sole cost and expense. Borrower shall promptly notify Lender of any loss of or damage to the Collateral.

**16. REPAIRS AND MAINTENANCE.** Borrower agrees to keep and maintain, and to cause others to keep and maintain, the Collateral in good order, repair and condition at all times while this Agreement remains in effect. Borrower further agrees to pay when due all claims for work done on, or services rendered or material furnished in connection with the Collateral so that no lien or encumbrance may ever attach to or be filed against the Collateral.

**17. INSPECTION OF COLLATERAL AND PLACE OF BUSINESS; USE OF PHOTOGRAPHS AND TESTIMONIALS.** Lender and Lender's designated representatives and agents shall have the right during Borrower's normal business hours and at any other reasonable time to examine the Collateral wherever located and the interior and exterior of any Borrower place of business. During an examination of any Borrower place of business, Lender may examine, among other things, whether Borrower (i) has a place of business that is separate from any personal residence, (ii) is open for business, (iii) has sufficient inventory to conduct Borrower's business and (iv) has one or more credit card terminals if Borrower processes credit card transactions. When performing an examination, Lender may photograph the interior and exterior of any Borrower place of business, including any signage, and may photograph any individual who has signed the Agreement ("Signatory") unless the Signatory previously has notified Lender that he or she does not authorize Lender to photograph the Signatory. Lender may obtain testimonials from any Signatory, including testimonials on why Borrower needed the Loan and how the Loan has helped Borrower. Any photograph and testimonial will become and remain the sole property of Lender. Borrower and each Signatory grant Lender the irrevocable and permanent right to display and share any photograph and testimonial in all forms and media, including composite and modified representations, for all purposes, including but not limited to any trade or commercial purpose, with any Lender employees and agents and with the general public. Lender may, but is not required to, use the name of any Borrower and Signatory as a credit in connection with any photograph and testimonial. Borrower and each Signatory waive the right to inspect or approve versions of any photograph or testimonial or the written copy or other media

**Exhibit "D"** **Page 6 of 16**

# ondeck

**BUSINESS LOAN AND SECURITY AGREEMENT**

that may be used in connection with same. Borrower and each Signatory release Lender from any claims that may arise regarding the use of any photograph or testimonial, including any claims of defamation, invasion of privacy or infringement of moral rights, rights of publicity or copyright.

**18. LENDER'S EXPENDITURES.** If any action or proceeding is commenced that would materially affect Lender's interest in the Collateral or if Borrower fails to comply with any provision of this Agreement or any related documents, including but not limited to Borrower's failure to discharge or pay when due any amounts Borrower is required to discharge or pay under this Agreement or any related documents, Lender on Borrower's behalf may (but shall not be obligated to) take any action that Lender deems appropriate, including but not limited to discharging or paying all taxes, liens, security interests, encumbrances and other claims, at any time levied or placed on the Collateral and paying all costs for insuring, maintaining and preserving the Collateral. To the extent permitted by applicable law, all such expenses will become a part of the Obligations and, at Lender's option, will: (i) be payable on demand; (ii) be added to the balance of the Loan and be apportioned among and be payable with any installment payments to become due during the remaining term of the Loan; or (iii) be treated as a balloon payment that will be due and payable at the Loan's maturity. Such right shall be in addition to all other rights and remedies to which Lender may be entitled upon an Event of Default.

**19. BORROWER'S REPRESENTATIONS AND WARRANTIES.** Borrower represents and warrants that: (i) Borrower will comply with all laws, statutes, regulations and ordinances pertaining to the conduct of Borrower's business and promises to hold Lender harmless from any damages, liabilities, costs, expenses (including attorneys' fees) or other harm arising out of any violation thereof; (ii) Borrower's principal executive office and the office where Borrower keeps its records concerning its accounts, contract rights and other property, is that shown in the application; (iii) Borrower is duly organized, licensed, validly existing and in good standing under the laws of its state of formation and shall hereafter remain in good standing in that state, and is duly qualified, licensed and in good standing in every other state in which it is doing business, and shall hereafter remain duly qualified, licensed and in good standing in every other state in which it is doing business, and shall hereafter remain duly qualified, licensed and in good standing in every other state in which the failure to qualify or become licensed could have a material adverse effect on the financial condition, business or operations of Borrower; (iv) the true and correct legal name of the Borrower is set forth in the application; (v) the aggregate ownership percentage of the Signatories is greater than or equal to fifty percent (50%) of the Borrower's business; (vi) the execution, delivery and performance of this Agreement, and any other document executed in connection herewith, are

within Borrower's powers, have been duly authorized, are not in contravention of law or the terms of Borrower's charter, by-laws or other constating documents, or of any indenture, agreement or undertaking to which Borrower is a party; (vii) all constating documents and all amendments thereto of Borrower have been duly filed and are in proper order and any capital stock issued by Borrower and outstanding was and is properly issued and all books and records of Borrower are accurate and up to date and will be so maintained; (viii) Borrower (a) is subject to no charter, corporate or other legal restriction, or any judgment, award, decree, order, governmental rule or regulation or contractual restriction that could have a material adverse effect on its financial condition, business or prospects, and (b) is in compliance with its charter, by-laws and other constating documents, all contractual requirements by which it may be bound and all applicable laws, rules and regulations other than laws, rules or regulations the validity or applicability of which it is contesting in good faith or provisions of any of the foregoing the failure to comply with which cannot reasonably be expected to materially adversely affect its financial condition, business or prospects or the value of the Collateral; and (ix) there is no action, suit, proceeding or investigation pending or, to Borrower's knowledge, threatened against or affecting it or any of its assets before or by any court or other governmental authority which, if determined adversely to it, would have a material adverse effect on its financial condition, business or prospects or the value of the Collateral.

**20. INTEREST AND FEES.** Borrower agrees to pay in full the interest set forth in the accompanying Business Loan and Security Agreement Supplement. In addition to any other fees described in the Agreement, Borrower agrees to pay the following fees:

A. Origination Fee: A one-time Origination Fee in the amount set forth in the accompanying Business Loan and Security Agreement Supplement. Borrower agrees that this fee will be immediately deducted from the proceeds of Borrower's Loan.

B. Returned Payment Fee: A Returned Payment Fee in the amount set forth in the accompanying Business Loan and Security Agreement Supplement if any electronic payment processed on Borrower's Loan is returned unpaid or dishonored for any reason.

C. Late Fee: A Late Fee in the amount set forth in the accompanying Business Loan and Security Agreement Supplement if a scheduled payment is not received by Lender as provided in the payment schedule set forth in the accompanying Business Loan and Security Agreement Supplement.

Payments made by Borrower hereunder will be applied and allocated between Loan principal, interest and fees in the manner set forth in Section 8.

**21. INTEREST AND FEES EXCEEDING PERMITTED**

**Exhibit "D"**                **Page 7 of 16**

**ondeck**

**LIMIT.** If the Loan is subject to a law that sets maximum charges, and that law is finally interpreted so that the interest or other fees collected or to be collected in connection with this Agreement exceed the permitted limits, then (i) any such charge will be reduced by the amount necessary to reduce the charge to the permitted limit and (ii) if required by applicable law, any sums already collected from Borrower that exceed the permitted limits will be refunded or credited to Borrower.

**22. ONLINE CUSTOMER PORTAL.** When Borrower signs in with Borrower's valid username and password at loans.ondeck.com, Borrower can obtain information about the Borrower's Loan, such as the outstanding balance, daily transactions and fees. No additional paper statement will be mailed to Borrower. Borrower agrees not to share Borrower's username and password to loans.ondeck.com with any third party.

**23. FINANCIAL INFORMATION AND REEVALUATION OF CREDIT.** Borrower and each Guarantor (if any) authorize Lender to obtain business and personal credit bureau reports in Borrower's and any Guarantor's name, respectively, at any time and from time to time for purposes of deciding whether to approve the requested Loan or for any update, renewal, extension of credit or other lawful purpose. Upon Borrower's or any Guarantor's request, Lender will advise Borrower or Guarantor if Lender obtained a credit report and Lender will give Borrower or Guarantor the credit bureau's name and address. Borrower and each Guarantor (if any) agree to submit current financial information, a new credit application, or both, in Borrower's name and in the name of each Guarantor, respectively, at any time promptly upon Lender's request. Borrower authorizes Lender to act as Borrower's agent for purposes of accessing and retrieving transaction history information regarding Borrower from Borrower's designated merchant processor(s). Lender may report Lender's credit experiences with Borrower and any Guarantor of Borrower's Loan to third parties as permitted by law, including with respect to any Guarantor to consumer credit reporting agencies. Borrower also agrees that Lender may release information to comply with governmental reporting or legal process that Lender believes may be required, whether or not such is in fact required, or when necessary or helpful in completing a transaction, or when investigating a loss or potential loss. Borrower and each Guarantor is hereby notified that a negative credit report reflecting on Borrower's and/or any Guarantor's credit record may be submitted to a credit reporting agency (including with respect to any Guarantor to consumer credit reporting agencies) if Borrower or such Guarantor fails to fulfill the terms of their respective credit obligations hereunder. Guarantor acknowledges that any credit reporting on the Loan shall be at the sole discretion of Lender (subject to applicable law) and that Lender has the right to report the Loan to the

Guarantor's personal credit file should Guarantor not pay any Obligation pursuant to the guaranty set forth in this Agreement.

**24. ATTORNEYS' FEES AND COLLECTION COSTS.** To the extent not prohibited by applicable law, Borrower shall pay to Lender on demand any and all expenses, including, but not limited to, collection costs, all attorneys' fees and expenses, and all other expenses of like or unlike nature which may be expended by Lender to obtain or enforce payment of Obligations either as against Borrower or any guarantor or surety of Borrower or in the prosecution or defense of any action or concerning any matter arising out of or connected with the subject matter of this Agreement, the Obligations or the Collateral or any of Lender's rights or interests therein or thereto, including, without limiting the generality of the foregoing, any counsel fees or expenses incurred in any bankruptcy or insolvency proceedings and all costs and expenses (including search fees) incurred or paid by Lender in connection with the administration, supervision, protection or realization on any security held by Lender for the debt secured hereby, whether such security was granted by Borrower or by any other person primarily or secondarily liable (with or without recourse) with respect to such debt, and all costs and expenses incurred by Lender in connection with the defense, settlement or satisfaction of any action, claim or demand asserted against Lender in connection therewith, which amounts shall be considered advances to protect Lender's security, and shall be secured hereby. To the extent permitted by applicable law, all such expenses will become a part of the Obligations and, at Lender's option, will: (i) be payable on demand; (ii) be added to the balance of the Loan and be apportioned among and be payable with any installment payments to become due during the remaining term of the Loan; or (iii) be treated as a balloon payment that will be due and payable at the Loan's maturity. Such right shall be in addition to all other rights and remedies to which Lender may be entitled upon an Event of Default.

**25. BORROWER'S REPORTS.** Promptly upon Lender's written request, Borrower and each Guarantor agrees to provide Lender with such information about the financial condition and operations of Borrower or any Guarantor, as Lender may, from time to time, reasonably request. Borrower also agrees promptly upon becoming aware of any Event of Default, or the occurrence or existence of an event which, with the passage of time or the giving of notice or both, would constitute an Event of Default hereunder, to promptly provide notice thereof to Lender in writing.

**26. TELEPHONE COMMUNICATIONS.** Borrower and Guarantors hereby expressly consents to receiving calls and messages, including auto-dialed and pre-recorded message calls and SMS messages (including text messages) from Lender, its affiliates, marketing partners, agents and others

**ondeck**

calling at Lender's request or on its behalf, at any telephone numbers that Borrower and/or Guarantors have provided or may provide in the future or otherwise in Lender's possession (including any cellular or mobile telephone numbers). Borrower and Guarantor agree that such communications may be initiated using an automated telephone dialing system.

**27. INDEMNIFICATION.** Except for Lender's gross negligence or willful misconduct, Borrower will indemnify and save Lender harmless from all losses, costs, damage, liabilities or expenses (including, without limitation, court costs and reasonable attorneys' fees) that Lender may sustain or incur by reason of defending or protecting Lender's security interest or the priority thereof or enforcing the Obligations, or in the prosecution or defense of any action or proceeding concerning any matter arising out of or in connection with this Agreement and/or any other documents now or hereafter executed in connection with this Agreement and/or the Obligations and/or the Collateral. This indemnity shall survive the repayment of the Obligations and the termination of this Agreement.

**28. MERGERS, CONSOLIDATIONS OR SALES.** Borrower represents and agrees that Borrower will not (i) merge or consolidate with or into any other business entity or (ii) enter into any joint venture or partnership with any person, firm or corporation.

**29. CHANGE IN LEGAL STATUS.** Without Lender's consent, Borrower represents and agrees that Borrower will not (i) change its name, its place of business or, if more than one, chief executive office, its mailing address, or organizational identification number if it has one, or (ii) change its type of organization, jurisdiction of organization or other legal structure. If Borrower does not have an organizational identification number and later obtains one, Borrower shall promptly notify Lender of such taxpayer identification number.

**30. DEFAULT.** The occurrence of any one or more of the following events (herein, "Events of Default") shall constitute, without notice or demand, a default under this Agreement and all other agreements between Lender and Borrower and instruments and papers given Lender by Borrower, whether such agreements, instruments, or papers now exist or hereafter arise: (i) Lender is unable to collect any Automatic Payment Plan payment on two consecutive dates due and/or, Borrower fails to pay any Obligations on two consecutive dates due; (ii) Borrower fails to comply with, promptly, punctually and faithfully perform or observe any term, condition or promise within this Agreement; (iii) the determination by Lender that any representation or warranty heretofore, now or hereafter made by Borrower to Lender, in any documents, instrument, agreement, or paper was not true or accurate when given; (iv) the occurrence of any event such that any indebtedness of Borrower from any lender other than Lender could be

accelerated, notwithstanding that such acceleration has not taken place; (v) the occurrence of any event that would cause a lien creditor, as that term is defined in Section 9–102 of the Uniform Commercial Code, (other than Lender) to take priority over the Loan made by Lender; (vi) a filing against or relating to Borrower (unless consented to in writing by Lender) of (a) a federal tax lien in favor of the United States of America or any political subdivision of the United States of America, or (b) a state tax lien in favor of any state of the United States of America or any political subdivision of any such state; (vii) the occurrence of any event of default under any other agreement between Lender and Borrower or instrument or paper given Lender by Borrower, whether such agreement, instrument, or paper now exists or hereafter arises (notwithstanding that Lender may not have exercised its rights upon default under any such other agreement, instrument or paper); (viii) any act by, against, or relating to Borrower, or its property or assets, which act constitutes the application for, consent to, or sufferance of the appointment of a receiver, trustee or other person, pursuant to court action or otherwise, over all, or any part of Borrower's property; (ix) the granting of any trust mortgage or execution of an assignment for the benefit of the creditors of Borrower, or the occurrence of any other voluntary or involuntary liquidation or extension of debt agreement for Borrower; (x) the failure by Borrower to generally pay the debts of Borrower as they mature; (xi) adjudication of bankruptcy or insolvency relative to Borrower; (xii) the entry of an order for relief or similar order with respect to Borrower in any proceeding pursuant to Title 11 of the United States Code entitled "Bankruptcy" (the "Bankruptcy Code") or any other federal bankruptcy law; (xiii) the filing of any complaint, application or petition by or against Borrower initiating any matter in which Borrower is or may be granted any relief from the debts of Borrower pursuant to the Bankruptcy Code or any other insolvency statute or procedure; (xiv) the calling or sufferance of a meeting of creditors of Borrower; (xv) the meeting by Borrower with a formal or informal creditor's committee; (xvi) the offering by or entering into by Borrower of any composition, extension or any other arrangement seeking relief or extension for the debts of Borrower, or the initiation of any other judicial or non-judicial proceeding or agreement by, against or including Borrower that seeks or intends to accomplish a reorganization or arrangement with creditors; (xvii) the entry of any judgment against Borrower, which judgment is not satisfied or appealed from (with execution or similar process stayed) within 15 days of its entry; (xviii) the occurrence of any event or circumstance with respect to Borrower such that Lender shall believe in good faith that the prospect of payment of all or any part of the Obligations or the performance by Borrower under this Agreement or any other agreement between Lender and Borrower is impaired or there shall occur any material adverse change in the business or financial condition of Borrower (such event specifically includes, but is not limited to, taking additional financing from a credit card advance, cash advance company or an additional

**Exhibit "D"**

**Page 9 of 16**

# ondeck

working capital loan without the prior written consent of Lender); (xix) the entry of any court order that enjoins, restrains or in any way prevents Borrower from conducting all or any part of its business affairs in the ordinary course of business; (xx) the occurrence of any uninsured loss, theft, damage or destruction to any material asset(s) of Borrower; (xxi) any act by or against, or relating to Borrower or its assets pursuant to which any creditor of Borrower seeks to reclaim or repossess or reclaims or repossesses all or a portion of Borrower's assets; (xxii) the termination of existence, dissolution or liquidation of Borrower or the ceasing to carry on actively any substantial part of Borrower's current business; (xxiii) this Agreement shall, at any time after its execution and delivery and for any reason, cease to be in full force and effect or shall be declared null and void, or the validity or enforceability hereof shall be contested by Borrower or any guarantor of Borrower denies it has any further liability or obligation hereunder; (xxiv) any guarantor or person signing a support agreement in favor of Lender shall repudiate, purport to revoke or fail to perform his or her obligations under his guaranty or support agreement in favor of Lender or any corporate guarantor shall cease to exist; (xxv) any material change occurs in Borrower's ownership or organizational structure (acknowledging that any change in ownership will be deemed material when ownership is closely held); (xxvi) if Borrower is a sole proprietorship, the owner dies; if Borrower is a trust, a trustor dies; if Borrower is a partnership, any general or managing partner dies; if Borrower is a corporation, any principal officer or 10% or greater shareholder dies; if Borrower is a limited liability company, any managing member dies; if Borrower is any other form of business entity, any person(s) directly or indirectly controlling 10% or more of the ownership interests of such entity dies.

**31. RIGHTS AND REMEDIES UPON DEFAULT.** Subject to applicable law, if an Event of Default occurs under this Agreement, at any time thereafter, Lender may exercise any one or more of the following rights and remedies:

A. Refrain from Disbursing Loan Proceeds: Lender may refrain from disbursing Borrower's Loan proceeds to Borrower's Designated Checking Account.

B. Debit Amounts Due From Borrower's Accounts: Lender may debit from Borrower's Designated Checking Account all Automatic Payment Plan payments that Lender was unable to collect and/or the amount of any other Obligations that Borrower failed to pay.

C. Accelerate Indebtedness: Lender may declare the entire Obligations immediately due and payable, without notice of any kind to Borrower.

D. Assemble Collateral: Lender may require Borrower and/or Guarantor to deliver to Lender all or any portion of the Collateral and any and all certificates of title and other documents relating to the Collateral. Lender may

require Borrower and/or Guarantor to assemble the Collateral and make it available to Lender at a place to be designated by Lender. Lender also shall have full power to enter, provided Lender does so without a breach of the peace or a trespass, upon the property of Borrower and/or Guarantor to take possession of and remove the Collateral. If the Collateral contains other goods not covered by this Agreement at the time of repossession, Borrower and/or Guarantor agrees Lender may take such other goods, provided that Lender makes reasonable efforts to return them to Borrower and/or Guarantor after repossession.

E. Sell the Collateral: Lender shall have full power to sell, lease, transfer, or otherwise deal with the Collateral or proceeds thereof in Lender's own name or that of Borrower and/or Guarantor. Lender may sell the Collateral at public auction or private sale. Unless the Collateral threatens to decline speedily in value or is of a type customarily sold on a recognized market, Lender will give Borrower, Guarantor and other persons as required by law, reasonable notice of the time and place of any public sale, or the time after which any private sale or any other disposition of the Collateral is to be made. However, no notice need be provided to any person who, after an Event of Default occurs, enters into and authenticates an agreement waiving that person's right to notification of sale. The requirements of reasonable notice shall be met if such notice is given at least 10 days before the time of the sale or disposition. All expenses relating to the disposition of the Collateral, including without limitation the expenses of retaking, holding, insuring, preparing for sale and selling the Collateral, shall become a part of the Obligations secured by this Agreement. To the extent permitted by applicable law, all such expenses will become a part of the Obligations and, at Lender's option, will: (i) be payable on demand; (ii) be added to the balance of the Loan and be apportioned among and be payable with any installment payments to become due during either (a) the term of any applicable insurance policy or (b) the remaining term of the Loan; or (iii) be treated as a balloon payment that will be due and payable at the Loan's maturity.

F. Appoint Receiver: Lender shall have the right to have a receiver appointed to take possession of all or any part of the Collateral, with the power to protect and preserve the Collateral, to operate the Collateral preceding foreclosure or sale, and to collect the rents from the Collateral and apply the proceeds, over and above the cost of the receivership, against the Obligations. The receiver may serve without bond if permitted by law. Lender's right to the appointment of a receiver shall exist whether or not the apparent value of the Collateral exceeds the Obligations by a substantial amount.

# ondeck

BUSINESS LOAN AND SECURITY
AGREEMENT

Employment by Lender shall not disqualify a person from serving as a receiver.

G. Collect Revenues, Apply Accounts: Lender, either itself or through a receiver, may collect the payments, rents, income, and revenues from the Collateral. Lender may at any time in Lender's discretion transfer any Collateral into Lender's own name or that of Lender's nominee and receive the payments, rents, income and revenues therefrom and hold the same as security for the Obligations or apply it to payment of the Obligations in such order of preference as Lender may determine. Insofar as the Collateral consists of accounts, general intangibles, insurance policies, instruments, chattel paper, choses in action, or similar property, Lender may demand, collect, receipt for, settle, compromise, adjust, sue for, foreclose or realize on the Collateral as Lender may determine, whether or not any amount included within the Obligations is then due. For these purposes, Lender may, on behalf of and in the name of Borrower and/or Guarantor, receive, open and dispose of mail addressed to Borrower; change any address to which mail and payments are to be sent; and endorse notes, checks, drafts, money orders, documents of title, instruments and items pertaining to payment, shipment or storage of any Collateral. To facilitate collections, Lender may notify account debtors and obligors on any Collateral to make payments directly to Lender.

H. Obtain Deficiency: If Lender chooses to sell any or all of the Collateral, Lender may obtain a judgment against Borrower and/or Guarantor for any deficiency remaining on the Obligations due to Lender after application of all amounts received from the exercise of the rights provided in this Agreement. Borrower and/or Guarantor shall be liable for a deficiency even if the transaction described in this subsection is a sale of accounts or chattel paper.

I. Other Rights and Remedies: Lender shall have all the rights and remedies of a secured creditor under the provisions of the Uniform Commercial Code, as may be amended from time to time. In addition, Lender shall have and may exercise any or all other rights and remedies it may have available at law, in equity or otherwise.

J. Election of Remedies: Except as may be prohibited by applicable law, all of Lender's rights and remedies, whether evidenced by this Agreement, any related documents, or by any other writing, shall be cumulative and may be exercised singularly or concurrently. Election by Lender to pursue any remedy shall not exclude pursuit of any other remedy, and an election to make expenditures or to take action to perform an obligation of Borrower under the Agreement, after Borrower's failure to perform, shall not affect Lender's

right to declare a default and exercise its remedies.

**32. CONSENT TO JURISDICTION AND VENUE.** Subject to Section 33 below, Borrower, Guarantors and Lender agree that any action or proceeding to enforce or arising out of this Agreement may be brought in any court of the Commonwealth of Virginia or in the United States District Court for the Eastern District of Virginia, and Borrower and Guarantors waive personal service of process. Borrower, Guarantors and Lender agree that venue is proper in such courts.

**33. ARBITRATION.** To the extent that a claim or dispute arises out of, or in relation to this Agreement, including without limitation, the terms, construction, interpretation, performance, termination, breach, or enforceability of this Agreement, the parties (Borrower, Guarantors and Lender) hereby agree that the claim or dispute shall be, at the election of any party, resolved by mandatory binding arbitration in Virginia within a reasonable time period not to exceed ninety (90) days. The parties agree that the arbitration shall be administered by JAMS and the arbitration shall be conducted in accordance with the Expedited Procedures of the JAMS Comprehensive Arbitration Rules and Procedures except as otherwise agreed in this Agreement. The arbitrator shall be chosen in accordance with the procedures of JAMS, and shall base the award on applicable Virginia law. The parties agree that the arbitration shall be conducted by a single arbitrator. Judgment on the award may be entered in any court having jurisdiction, subject to Section 32 above. The parties further agree that the costs of the arbitration shall be divided equally between them, except that Lender will consider in good faith a request by Borrower to pay the costs of arbitration. Each party may pursue arbitration solely in an individual capacity, and not as a representative or class member in any purported class or representative proceeding. The arbitrator may not consolidate more than one person's or entity's claims, and may not otherwise preside over any form of a representative or class proceeding. This arbitration section is governed by the Federal Arbitration Act, 9 U.S.C. §§ 1-16.

**34. NO WAIVER BY LENDER.** No delay or omission on the part of Lender in exercising any rights under this Agreement, any related guaranty or applicable law shall operate as a waiver of such right or any other right. Waiver on any one occasion shall not be construed as a bar to or waiver of any right or remedy on any future occasion. All Lender's rights and remedies, whether evidenced hereby or by any other agreement, instrument or paper, shall be cumulative and may be exercised singularly or concurrently.

**35. ASSIGNMENT.** This Agreement shall bind and inure to the benefit of the respective successors and assigns of each of the parties hereto; provided, however, that Borrower may not assign this Agreement or any rights or duties

**Exhibit "D"**

**Page 11 of 16**

# ondeck

BUSINESS LOAN AND SECURITY
AGREEMENT

hereunder without Lender's prior written consent and any prohibited assignment shall be absolutely null and void. No consent to an assignment by Lender shall release Borrower from its Obligations. Lender may assign this Agreement and its rights and duties hereunder and no consent or approval by Borrower is required in connection with any such assignment. Lender reserves the right to sell, assign, transfer, negotiate or grant participations in all or any part of, or any interest in Lender's rights and benefits hereunder. In connection with any assignment or participation, Lender may disclose all documents and information that Lender now or hereafter may have relating to Borrower or Borrower's business. To the extent that Lender assigns its rights and obligations hereunder to another party, Lender thereafter shall be released from such assigned obligations to Borrower and such assignment shall affect a novation between Borrower and such other party. On Deck Capital, Inc. (in its capacity as Servicer) or a successor servicer (if any) shall, acting solely for this purpose as a non-fiduciary agent of Borrower, maintain at one of its offices in the United States a copy of each assignment agreement delivered to it with respect to this Loan and a register for the recordation of the name of each assignee of this Loan, and principal and interest amount of this Loan owing to, such assignee pursuant to the terms hereof. The entries in such register shall be conclusive, and Borrower, Lender and each such assignee may treat each person whose name is recorded therein pursuant to the terms hereof as a "Lender" hereunder for all purposes of this Agreement, notwithstanding notice to the contrary. The register maintained for this Loan shall be available for inspection by Borrower and any such assignee of this Loan, at any reasonable time upon reasonable prior notice to On Deck Capital, Inc. (in its capacity as Servicer) or the applicable successor servicer (if any). This Section 35 shall be construed so that this Loan is at all times maintained in "registered form" within the meaning of Sections 163(f), 871(h)(2) and 881(c)(2) of the Internal Revenue Code and any related Treasury regulations (or any other relevant or successor provisions of the Internal Revenue Code or of such Treasury regulations).

**36. INTERPRETATION.** Paragraph and section headings used in this Agreement are for convenience only, and shall not affect the construction of this Agreement. Neither this Agreement nor any uncertainty or ambiguity herein shall be construed or resolved against Lender or Borrower, whether under any rule of construction or otherwise. On the contrary, this Agreement has been reviewed by all parties and shall be construed and interpreted according to the ordinary meaning of the words used so as to fairly accomplish the purposes and intentions of all parties hereto.

**37. SEVERABILITY.** If one or more provisions of this Agreement (or the application thereof) is determined invalid, illegal or unenforceable in any respect in any jurisdiction,

the same shall not invalidate or render illegal or unenforceable such provision (or its application) in any other jurisdiction or any other provision of this Agreement (or its application).

**38. NOTICES.** Except as otherwise provided in this Agreement, notice under this Agreement must be in writing. Notices will be deemed given when deposited in the U.S. mail, postage prepaid, first class mail; when delivered in person; when sent by registered mail; by certified mail; or by nationally recognized overnight courier; or when sent by electronic mail. Notice to Borrower will be sent to Borrower's last known address or electronic mail address in Lender's records for this Loan. Notice to Lender may be sent to: On Deck Capital, 901 N Stuart Street, Suite 700, Arlington, VA 22203, Attn: Director of Operations.

**39. RECORDKEEPING AND AUDIT REQUIREMENTS.** Lender shall have no obligation to maintain any electronic records or any documents, schedules, invoices or any other paper delivered to Lender by Borrower in connection with this Agreement or any other agreement other than as required by law. Borrower will at all times keep accurate and complete records of Borrower's accounts and Collateral. At Lender's request, Borrower shall deliver to Lender: (i) schedules of accounts and general intangibles; and (ii) such other information regarding the Collateral as Lender shall request. Lender, or any of its agents, shall have the right to call any telephone numbers that Borrower has provided or may provide in the future or otherwise in the Lender's possession (including any cellular or mobile telephone numbers),at intervals to be determined by Lender, and without hindrance or delay, to inspect, audit, check, and make extracts from any copies of the books, records, journals, orders, receipts, correspondence that relate to Borrower's accounts and Collateral or other transactions between the parties thereto and the general financial condition of Borrower and Lender may remove any of such records temporarily for the purpose of having copies made thereof. If Borrower was referred to Lender for this Loan by a third party (the "Referring Party"), then Borrower consents to Lender sharing certain reasonable information about Borrower with the Referring Party for purposes of the Referring Party verifying and/or auditing loans made through such Referring Party's referrals.

**40. GOVERNING LAW.** Subject to Section 33 above, our relationship including this Agreement and any claim, dispute or controversy (whether in contract, tort, or otherwise) at any time arising from or relating to this Agreement is governed by, and this Agreement will be construed in accordance with, applicable federal law and (to the extent not preempted by federal law) Virginia law without regard to internal principles of conflict of laws. The legality, enforceability and interpretation of this Agreement and the amounts contracted for, charged and reserved under this

**Exhibit "D"**                    **Page 12 of 16**

# ondeck

BUSINESS LOAN AND SECURITY
AGREEMENT

Agreement will be governed by such laws. Borrower understands and agrees that (i) Lender is located in Virginia, (ii) Lender makes all credit decisions from Lender's office in Virginia, (iii) the Loan is made in Virginia (that is, no binding contract will be formed until Lender receives and accepts Borrower's signed Agreement in Virginia) and (iv) Borrower's payments are not accepted until received by Lender in Virginia.

**41. WAIVER OF NOTICES AND OTHER TERMS.** Except for any notices provided for in this Agreement, Borrower and any person who has obligations pursuant to this Agreement (e.g., a Guarantor), to the extent not prohibited by applicable law hereby, waives demand, notice of nonpayment, notice of intention to accelerate, notice of acceleration, presentment, protest, notice of dishonor and notice of protest. To the extent permitted by applicable law, Borrower and any person who has obligations pursuant to this Agreement also agrees: Lender is not required to file suit, show diligence in collection against Borrower or any person who has obligations pursuant to this Agreement, or proceed against any Collateral; Lender may, but will not be obligated to, substitute, exchange or release any Collateral; Lender may release any Collateral, or fail to realize upon or perfect Lender's security interest in any Collateral; Lender may, but will not be obligated to, sue one or more persons without joining or suing others; and Lender may modify, renew, or extend this Agreement (repeatedly and for any length of time) without notice to or approval by any person who has obligations pursuant to this Agreement (other than the party with whom the modification, renewal or extension is made).

**42. MONITORING, RECORDING AND ELECTRONIC COMMUNICATIONS.** In order to ensure a high quality of service for Lender's customers, Lender may monitor and/or record telephone calls between Borrower and Lender's employees or agents. Borrower acknowledges that Lender may do so and agrees in advance to any such monitoring or recording of telephone calls. Borrower also agrees that Lender may communicate with Borrower electronically by e-mail.

**43. JURY TRIAL WAIVER AND CLASS ACTION WAIVER.** To the extent not prohibited by applicable law, Borrower, Guarantors and Lender waive their right to a trial by jury of any claim or cause of action based upon, arising out of or related to the Agreement and all other documentation evidencing the Obligations, in any legal action or proceeding. Subject to Section 33 above, any such claim or cause of action shall be tried by court sitting without a jury.

THE PARTIES HERETO (LENDER, BORROWER AND GUARANTORS) WAIVE ANY RIGHT TO ASSERT ANY CLAIMS AGAINST ANY OTHER PARTY AS A REPRESENTATIVE OR MEMBER IN ANY CLASS OR REPRESENTATIVE ACTION, EXCEPT WHERE SUCH WAIVER IS PROHIBITED BY LAW OR AGAINST PUBLIC POLICY. TO THE EXTENT ANY PARTY IS PERMITTED BY LAW OR COURT OF LAW TO PROCEED WITH A CLASS OR REPRESENTATIVE ACTION AGAINST ANY OTHER, THE PARTIES HEREBY AGREE THAT: (1) THE PREVAILING PARTY SHALL NOT BE ENTITLED TO RECOVER ATTORNEYS' FEES OR COSTS ASSOCIATED WITH PURSUING THE CLASS OR REPRESENTATIVE ACTION (NOT WITHSTANDING ANY OTHER PROVISION IN THIS AGREEMENT); AND (2) THE PARTY WHO INITIATES OR PARTICIPATES AS A MEMBER OF THE CLASS WILL NOT SUBMIT A CLAIM OR OTHERWISE PARTICIPATE IN ANY RECOVERY SECURED THROUGH THE CLASS OR REPRESENTATIVE ACTION.

**44. CONFIDENTIALITY.** Borrower shall not make, publish or otherwise disseminate in any manner a copy of this Agreement or any public statement or description of the terms of this Agreement, except to its employees, advisors and similar persons who have a legitimate need to know its contents.

**45. ENTIRE AGREEMENT.** Any application Borrower signed or otherwise submitted in connection with the Loan, the accompanying Business Loan and Security Agreement Supplement and the Authorization Agreement for Direct Deposit (ACH Credit) and Direct Payments (ACH Debits) and any other documents required by Lender now or in the future in connection with this Agreement and Borrower's Loan are hereby incorporated into and made a part of this Agreement. This Agreement is the entire agreement of the parties with respect to the subject matter hereof and supersedes any prior written or verbal communications or instruments relating thereto.

**46. COUNTERPARTS; ELECTRONIC SIGNATURES.** This Agreement may be executed in one or more counterparts, each of which counterparts shall be deemed to be an original, and all such counterparts shall constitute one and the same instrument. For purposes of the execution of this Agreement, signatures delivered by electronic or fax transmission shall be treated in all respects as original signatures.

**47. CUSTOMER SERVICE CONTACT INFORMATION.** If you have questions or comments about your Loan, you may contact us by (i) e-mail at support@ondeck.com, (ii) telephone at (888) 269-4246 or (iii) mail at 901 N Stuart Street, Suite 700, Arlington, VA 22203, Attn: Director of Operations.

**Exhibit "D"**                                **Page 13 of 16**

# ondeck

**48. GRANT OF LICENSE TO USE THE ON DECK PLATFORM.** Subject to Borrower's compliance with this Agreement and the Terms of Use for the On Deck Platform, Lender grants Borrower a nonexclusive, revocable, non-transferable, non-sublicenseable, limited right and royalty-free license to use the On Deck Platform, effective solely during the term of the Loan and so long as an Event of Default has not occurred. The license granted to Borrower is personal, and no rights hereunder may be transferred by Borrower without the express written approval of Lender. Lender may terminate the license granted hereunder without notice at any time after an Event of Default has occurred.

**49. PERSONAL GUARANTY.** Each Guarantor, jointly and severally (if more than one), absolutely and unconditionally guarantee the prompt payment to Lender, including its successors and assignees, of any and all Obligations incurred by the Borrower pursuant to the Agreement (this "Personal Guaranty"). Each Guarantor further agrees to repay the Obligations on demand, without requiring Lender first to enforce payment against Borrower.   This is a guarantee of payment and not of collection.   This is an absolute, unconditional, primary, and continuing obligation and will remain in full force and effect until the first to occur of the following:   (a) all of the Obligations have been indefeasibly paid in full, and Lender has terminated this Personal Guaranty, or (b) 30 days after the date on which written notice of revocation is actually received and accepted by Lender.  No revocation will affect: (i) the then existing liabilities of the revoking Guarantor under this Personal Guaranty; (ii) Obligations created, contracted, assumed, acquired or incurred prior to the effective date of such revocation; (iii) Obligations created, contracted, assumed, acquired or incurred after the effective date of such revocation pursuant to any agreement entered into or commitment obtained prior to the effective date of such revocation; or (iv) any Obligations then or thereafter arising under the agreements or instruments then in effect and then evidencing the Obligations. Each Guarantor represents and warrants that it is a legal resident of the United States of America. Each Guarantor waives all notices to which the Guarantor might otherwise be entitled by law, and also waives all defenses, legal or equitable, otherwise available to the Guarantor.   This Personal Guaranty shall be construed in accordance with the laws of the Commonwealth of Virginia, and shall inure to the benefit of Lender, its successors and assigns.   To the extent not prohibited by applicable law, each of the undersigned Guarantors waives its right to a trial by jury of any claim or cause of action based upon, arising out of or related to this guaranty, the Agreement and all other documentation evidencing the Obligations, in any legal action or proceeding.  Subject to Section 33 above, any such claim or cause of action shall be tried by court sitting without a jury.

**50. CERTIFICATION AND SIGNATURES.** By executing this Agreement or authorizing the person signing or affirming below to execute on its behalf, Borrower certifies that Borrower has received a copy of this Agreement and that Borrower has read, understood and agreed to be bound by its terms.  Each person signing or affirming below certifies that each person is signing on behalf of the Borrower and/or in the capacity indicated below the signer's name (and if Borrower is a sole proprietorship, in the capacity of the owner of such sole proprietorship) and that such signer is authorized to execute this Agreement on behalf of or in the stated relation to Borrower.

<u>Use of Proceeds Certification</u>

As referred to in Section 4, by signing or affirming below, the Borrower certifies, acknowledges and understands that the proceeds from the requested Loan will be used solely for purchasing or acquiring specific products or services, for the following purposes only:

- specified merchandise
- insurance (but not self insurance programs)
- services or equipment
- inventory or other specified goods
- improvements / construction of facilities (but not purchase of real estate)
- loans to finance specified sales transactions
- public works projects or educational services (e.g., training)

**Exhibit "D"**                    **Page 14 of 16**

# ondeck

# AUTHORIZATION AGREEMENT FOR DIRECT DEPOSIT (ACH CREDIT) AND DIRECT PAYMENTS (ACH DEBITS)

This Authorization Agreement for Direct Deposit (ACH Credit) and Direct Payments (ACH Debits) is part of (and incorporated by reference into) the Business Loan and Security Agreement. Borrower should keep this important legal document for Borrower's records.

**DISBURSMENT OF LOAN PROCEEDS.** By executing this Authorization Agreement for Direct Deposit (ACH Credit) and Direct Payments (ACH Debits), Borrower authorizes Lender to disburse the Loan proceeds less the amount of any applicable fees upon Loan approval by initiating an ACH credit, wire transfer or similar means to the checking account indicated herein (or a substitute checking account Borrower later identifies and is acceptable to Lender) (hereinafter referred to as the "Designated Checking Account") in the disbursal amount set forth in the accompanying Business Loan and Security Agreement Supplement. This authorization is to remain in full force and effect until Lender has received written notification from Borrower of its termination in such time and in such manner as to afford Lender and Borrower's depository bank a reasonable opportunity to act on it.

**AUTOMATIC PAYMENT PLAN.** Enrollment in Lender's Automatic Payment Plan is required for Loan approval. By executing this Authorization Agreement for Direct Deposit (ACH Credit) and Direct Payments (ACH Debits), Borrower agrees to, and hereby, enrolls in the Automatic Payment Plan and authorizes Lender to collect payments required under the terms of Borrower's Business Loan and Security Agreement by initiating ACH debit entries to the Designated Checking Account in the amounts and on the dates provided in the payment schedule set forth in the accompanying Business Loan and Security Agreement Supplement. Borrower authorizes Lender to increase the amount of any scheduled ACH debit entry or assess multiple ACH debits for the amount of any previously scheduled payment(s) that was not paid as provided in the payment schedule and any unpaid Fees. This authorization is to remain in full force and effect until Lender has received written notification from Borrower of its termination in such time and in such manner as to afford Lender and Borrower's depository bank a reasonable opportunity to act on it. Lender may suspend or terminate Borrower's enrollment in the Automatic Payment Plan immediately if Borrower fails to keep Borrower's designated checking account in good standing or if there are insufficient funds in Borrower's checking account to process any payment (or if Lender is otherwise unable to collect any amounts by ACH debit owed to Lender under the Loan or under any other loan or extension of credit by Lender to Borrower). **If Borrower revokes the authorization or Lender suspends or terminates Borrower's enrollment in the Automatic Payment Plan, Borrower still will be responsible for making timely payments pursuant to the alternative payment methods described in the Business Loan and Security Agreement.**

**BUSINESS PURPOSE ACCOUNT.** By executing this Authorization Agreement for Direct Deposit (ACH Credit) and Direct Payments (ACH Debits), Borrower attests that the Designated Checking Account was established for business purposes and not primarily for personal, family or household purposes.

**ACCOUNT CHANGES.** Borrower agrees to promptly notify Lender in writing if there are any changes to the account and routing numbers of the Designated Checking Account.

**MISCELLANEOUS.** Lender is not responsible for any fees charged by Borrower's bank as the result of credits or debits initiated under this agreement. The origination of ACH transactions to Borrower's account must comply with the provisions of U.S. law.

| | | | |
|---|---|---|---|
| Routing Number: | 073922458 | Account Number: | 00718528 |
| Tax ID: | 364561443 | | |
| By: | **Douglas Buster** | | |
| | (Signature) | | |
| Name: | Douglas Buster | | |
| Date: | 2017-10-25 | | |

**Exhibit "D"**              **Page 15 of 16**

# ondeck

# Signature Page

I hereby, as a duly authorized agent of Borrower, and in my individual and personal capacity as Guarantor, affirm that I have read and understand the terms and conditions of, consent to, and agree to be bound by, the Business Loan and Security Agreement (inclusive of the Guaranty therein), the accompanying Business Loan and Security Agreement Supplement, and the accompanying Authorization Agreement for Direct Deposit (ACH Credits) and Direct Payments (ACH Debits).

| | | | |
|---|---|---|---|
| **Guarantor #1:** | Douglas Buster | **Borrower:** | **PEARL CITY GARAGE, INC.** |
| | (Signature) | **By:** | Douglas Buster |
| **Name:** | Douglas Buster | | (Signature) |
| **Date:** | 2017-10-25 | **Name:** | Douglas Buster |
| | | **Date:** | 2017-10-25 |
| **Guarantor #2:** | | **By:** | |
| | (Signature) | | (Signature) |
| **Name:** | | **Name:** | |
| **Date:** | | **Date:** | |
| **Guarantor #3:** | | **By:** | |
| | (Signature) | | (Signature) |
| **Name:** | | **Name:** | |
| **Date:** | | **Date:** | |

| | |
|---|---|
| For Lender's Use Only: This Agreement has been received and accepted by Lender in Virginia after being signed by Borrower and any Guarantor(s). | |
| By: | Aisha Youins |
| | (Signature) |
| | Aisha Youins |
| | (Name) |
| Date: | 2017-10-25 |

**Exhibit "D"**

**Page 16 of 16**